AO 243 (Rev. 01/15)  

**15-CV-62112-COOKE/WHITE**  

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

### SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District: *SO. DIST. OF FLA - MIAMI* |
|---|---|
| Name (under which you were convicted) <br> Douglas Newton | Docket or Case No.: <br> 11-60150-CR-Cooke |
| Place of Confinement: *TAFT CORRECTIONAL FACILITY* | Prisoner No. *96993-004* |
| UNITED STATES OF AMERICA <br> V. | Movant *Douglas Newton, pro se* |

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   US District Court - Southern District of Florida –
   Miami Division

   (b) Criminal docket or case number (if you know):
   #11-60150-CR-Cooke

2. (a) Date of the judgment of conviction (if you know):
   May 10, 2012

   (b) Date of sentencing:
   Nov. 9, 2012

3. Length of sentence: *1 followed by 1 year supervised release*
   30 months jail

4. Nature of crime (all counts):
   Mail Fraud       ... Count 1 and 2
   Securities Fraud  ... Counts 3,4,6 and 7
   Conspiracy to Commit
    Securities Fraud ..    Count 5

5. (a) What was your plea?  (Check one)

   (1) Not guilty [X]          (2) Guilty          (3) Nolo contendere (no contest)

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or what did you plead guilty to and what did you plead not guilty to?

   *N/A*

6. If you went to trial, what kind of trial did you have?  (Check one) Jury  [ yes ]

7. Did Did you testify at a pretrial hearing, trial, or post-trial hearing?  **NO**

8. Did you appeal from the judgment of conviction?  **YES**

*Handwritten filing stamp box:*
FILED by _____ D.C.
OCT 06 2015
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

cat / div *2255/510/ DADE*
Case # _____
Judge *Cooke*   Mag *White*
Motn Ifp *NO*   Fee pd $ *NO*
Receipt # _____

AO 243 (Rev. 01/15)                                                                Page 3

9.   If you did appeal, answer the following:

(a) Name of court:  US Court of Appeals -- 11th Circuit

(b) Docket or case number (if you know):  12-16001

(c) Result:  AFFIRMED

(d) Date of result (if you know):  3-19-14

(e) Citation to the case (if you know):

(f) Grounds raised:

1) In determining intended loss, the Court did not consider market value of securities bought by fictitious fund
2) Court erred by imposing a position of trust enhancement where I had no relationship with the victims
3) Conviction must be vacated b/c govt. failed to prove offenses charged in indictment, and encouraged jury to convict on alternate grounds
4) Count #7 should be vacated b/c the sole conspirator testified he had no relationship with me regarding that transaction

(g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☑     No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know):  unknown

(2) Result:  DENIED

(3) Date of result (if you know):  10-6-14

(4) Citation to the case (if you know):  unknown

(5) Grounds raised:

After the 11th Circuit rejected our argument that my conviction should be vacated b/c the evidence failed to establish that I made a material misrepresentation to any person, we appealed to US Supreme Court challenging the 11th Circuit's conclusion that "a scheme to defraud has been broadly defined, and it may include more than fradulent misrepresentations." (US v. Newton, 559 F. App'x 902, 911 (unpublished). reh'g denied June 3, 2014.

The question we presented to Supreme Court for review is "whether the 11th Circuit's expansive definition of a 'scheme to defraud' renders the federal mail and securities fraud statutes unconstitutionally vague."

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes ☑     No ☐

11.  If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:  US District Ct. Southern Dist. of FL - Miami Division

(2) Docket or case number (if you know):  DE 150

(3) Date of filing (if you know):  6-25-12

(4) Nature of the proceeding:  Motion for New Trial

(5) Grounds raised:  We moved for new trial per Rule 33, arguing that improper evidence was introduced at trial and then was used extensively in govt's closing argument painting me as greedy man who spent pension fund's money for personal gain.  (See attached Exhibit D.)

AO 243 (Rev. 01-15)                                                                                                   Page 4

On 12-6-12, my counsel (Miguel Caridad) filed Motion for Bond Pending Appeal which was opposed by govt (DE 206, 208.) On 12-20-12, motion was denied (DE 212). We filed motion to reconsider and/or for a statement of reasons, which was denied (DE 214, 216.) (I surrendered to prison on Jan. 9, 2013.)

    (6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

        Yes ☐   No ☑

    (7)  Result: Both Motions DENIED (DE 216 on 1-15-13, and DE 230 on 11-13-13.)

    (8)  Date of result (if you know):

  (b)  If you filed any second motion, petition, or application, give the same information:

    (1)  Name of court: US District Ct. Southern District of FL -- Miami Division

    (2)  Docket of case number (if you know):

    (3)  Date of filing (if you know):

    (4)  Nature of the proceeding:

    (5)  Grounds raised:

On 11-01-13, my appellate counsel (Tracy Dreispul) filed Motion for Bond Pending Appeal (DE 229) with Judge Cooke (US District Court), after our appeal was approved for Oral Argument.  This new motion for bond was based on our opinion that b/c our appeal was placed on the oral argument calendar (to be heard on Feb 24, 2014), we believed the case presented "subtantial questions of law and fact" meriting an appellate bond.

    (6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

        Yes ☐   No ☑

    (7)  Result: Denied

    (8)  Date of result (if you know):

  (c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

    (1)  First petition:    Yes ☐    No ☑

    (2)  Second petition:  Yes ☐    No ☐

  (d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

My appellate attorney (Tracy Dreispul, AFPF) recommended we not ask Judge Cooke for a statement of her reasons for denying our bond, and not appeal her decision to the 11th Circuit court of Appeals.

12.    For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

AO 243 (Rev. 01/15)                                                                    Page 5

**GROUND ONE:** My due process (DP) rights were violated because of the way the govt. conceived and implemented this reverse sting against me and others (which netted over 30 indictments for DOJ and the SEC over the last 36-48 months.)

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

1) The govt. sting operation is in conflict with the goal and purpose of the FBI, whose director has publicly stated the goal of the bureau is designed to stop or fight crime, not to be involved in the set-up and "manufacture" of new crimes.

2) Other facts and factors supporting my Ground One claim are enumerated in my pro se motion (DE67) filed with Judge Cooke on March 15, 2012.

(Pro se motion DE 67 is attached Exhibit **I** .

(b)  **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☑

(2)  If you did not raise this issue in your direct appeal, explain why:

My appellate attorney (APFD Tracy Dreisput, Esq.) belived we had stronger isues to appeal, and I agreed with her and with the need to limit those issues to a select few.

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☑

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:   N / A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**   My due process rights were violated when the govt. gave misleading and/or untruthful info to Judge Cooke concerning my prior history and personal character -- when it had no such reliable or substantiated info in its possession at the time it targeted me.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

1) In replying to my due process motion DE67, the govt argued that as a "factual" matter, it had proof of my on-going securies violations --or before mid-March 2009 -- and also stated that I had come to the "attention of law enforcement as early as 2004". (This reference to its proof and to "law enforcement" is important for reasons given below.)

2) the govt/ further impugned my character and credibility by advising Judge Cooke that I was a liar who "continuously defrauded investors and deserved to be the target of the govt.'s undercover operation" (DE74.)

3) despite fact that the govt. did not have or did not submit any substantiated proof to Judge Cooke, she nonetheless relied -- in some part -- on the truth of the govt's statements (contained in DE74) and on what she was told by the AUSA when she denied my due process motion on Apr. 23, 2012.

4) The govt. did not tell the Judge that its sole or principal source of info about me came from its cooperating defendant, Richard Epstein (who was working to gain a sentence reduction for his own crimes) or that Epstein had recently been caught lying to his own case agent (FBI agent Michael Sputo.)

(b) **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☑

(2)   If you did not raise this issue in your direct appeal, explain why:

My Appellate attorney(AFPD Tracy Dreispul) believed we had stronger issues to appeal, and I agreed with her and the need to limit those issues to a select few.

(c) **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☑

AO 243 (Rev. 01/15)

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  N / A

Name and location of the court where the motion or petition was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)  Did you receive a hearing on your motion, petition, or application?

Yes [   ]     No [   ]

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes [   ]     No [   ]

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes [   ]     No [   ]

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:  My due process rights were violated when I was not able to ask the govt. questions at a hearing when the govt. appeared to add consideration of my "due process" motion to Judge Cooke's calendar for Apr 23, 2012.**

(Supporting facts)

1) At outset of hearings on numerous motions, Judge Cooke said "I am going to go through what I think are the motions that we have to decide in advance of trial next week."  She then read through her list which did NOT include my due process motion (DE 67) or the govt.'s reply to same (DE 74) See attached transcript Exhibit A, pages 1-4, and page 61.)

2) After the Judge asked if she "missed anything?", the AUSA said "I don't know if you want to address it now, the defendant filed a pro se motion . . . "  The Judge then asked her Deputy "Can you give me a copy of that? Was that on the docket sheet? I didn't see that."  The courtroom Deputy then asked "What document entry number is that?"

3) I do not recall being advised that my due-process motion would be taken up and ruled on at this hearing on this date, nor did my attorney raise any objections when the AUSA told Judge Cooke that I had a "history of suspected securities fraud" (See transcript of hearing p 2-4, and page 61.)

* * *

Case 0:11-cr-60150-MGC   Document 239   Entered on FLSD Docket 10/07/2015   Page 7 of 95

Excerpts from Apr. 23, 2012 hearing (pages 1-4 and page 61)          EXHIBIT A.

Page 7 B

19    MR. CARIDAD:  Yes, Your Honor.

20    THE COURT:  You will be appearing, obviously, and

21  acting on his behalf, and he knows he has a right to be here

22  and has chosen not to?

23    MR. CARIDAD:  That's right, Your Honor.

24    THE COURT:  Mr. Caridad, I'm going to go through what

25  I think are the motions that we have to decide in advance of

1   trial next week.  One is your Docket Entry Number 89,

2   defendant's motion to exclude a portion of the Government's

3   expert testimony concerning investment fraud schemes.

4       Then there is, Mr. Davidson, your motion, Docket

5   Entry 91, obvious motion to exclude Defendant Douglas Newton's

6   expert witnesses.

7       Mr. Caridad, your motion to quash the Government's

8   subpoena to produce, Docket Entry Number 96.  There is a

9   response to that, Docket Entry 97.  There is a supplemental

10  response to demand for expert disclosure, Docket Entry 98; and

11  I think those are all -- there are the proposed jury

12  instructions which I can take out of that.

13      And then there is Docket Entry 109, Government's

14  notice of intent to introduce evidence pursuant to Rule 9021;

15  and the Government's motion in limine to permit the

16  introduction of certain evidence, which is Docket Entry 110.

17      Anything I missed, Counsel?

18      MR. DAVIDSON:  Judge, I don't know if you want to

19  address now, the defendant filed a pro se motion to dismiss

20  the indictment basically saying that sting operations violate

21  his constitutional rights, and the Government had no reason

22  for going after him.  I filed a response basically citing case

Excerpts from Apr. 23, 2012 hearing (pages 1-4 and page 61)   **EXHIBIT A.**

23   law that these type of sting operations serve legitimate

24   government functions.  And in addition, we didn't just go

25   after him, he had a history of suspected securities fraud.  We

1   ask the Court to dismiss the defendant's pro se motion to

2   dismiss.

3          THE COURT:  Ivan, can you give me a copy of that?

4   Was that on the docket sheet?  I didn't see that.

5          THE COURTROOM DEPUTY:  What document entry number is

6   that?

7          MR. DAVIDSON:  Judge, I'll find out, one moment.

8          THE COURT:  Mr. Caridad, were you aware that your

9   client was acting on his own behalf in terms of this matter?

10          MR. CARIDAD:  I told him if he wanted to file that

11   motion, I would facilitate that.  So he sent it to me, and I

12   attached it to a pleading saying, "notice of defendant's pro

13   se motion" and filed it with the Court.

14          THE COURT:  Thank you very much, Mr. Caridad.  I

15   understand.

16          All right, we will get to that.  Ivan will pull me

17   out a copy.

18          Let's start, Mr. Caridad, with your motion to exclude

19   a portion of Government's expert testimony.

1        Now, Mr. Caridad, let's get to your client's filing

2   pro se, Docket Entry Number 67, which I think Mr. Davidson

3   does a good job in Docket Entry 74 of basically laying out

4   what it is, we know we can use these types of operations, we

5   know defendants don't like them, and I think that there is no

6   need for me to belabor the point.

7        Mr. Caridad, I appreciate you expediting the filing

8   of this on behalf of your client.  I understand your

9   situation, but Docket Entry Number 67, the motion to dismiss,

10  is denied.

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF FLORIDA
2                       CASE NO. 11-CR-60150-MGC

3

4   UNITED STATES OF AMERICA,

5              Plaintiff,                    APRIL 23, 2012
         vs.
6                                           MIAMI, FLORIDA
    DOUGLAS NEWTON,
7                                           Pages 1 - 71
               Defendant.

8   _____/

9

10                    TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE MARCIA G. COOKE
11                    UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:      H. RON DAVIDSON, AUSA
                            LUIS PEREZ, AUSA
15                          Office of U.S. Attorney
                            99 NE 4 Street
16                          Miami, Florida  33132

17
    For the Defendant:      MIGUEL CARIDAD, AFPD
18                          Office of U.S. Public Defender
                            150 W Flagler Street

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☑

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:                                    N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):          N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4) Did you appeal from the denial of your motion, petition, or application?          N/A

Yes ☐    No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:          N/A

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue:

in addition to GROUND FOUR (below) please see attachment for GROUND FIVE, SIX AND SEVEN.

**GROUND FOUR:  My due process rights were further violated when the govt. failed to
search for Brady information, specifically with respect to the materials in my SEC file.**

(Supporting facts)

1) In my motion (DE 182)), my attorney advised the Court that some testimony given by Agent
Sputo to attack me at trial was contradicted by materials and evidence in my SEC file.  However,
the govt. responded (DE 185) by telling Judge Cooke "As a legal matter, the govt. does not have
a constitutional duty to search for or disclose information possessed by other federal agencies
that are not involved in the investigation or prosecution of the case."

2) Thus, I assume the govt. did not examine my SEC file -- which would have shown that my
company's office was at my home, and that I did not spend any of the "pensioner's money" for
personal expenses (for my son's apartment, etc.) as stated by Agent Sputo at trial -- nor did it
search for Brady material.  (Data in my SEC file was extensive, including personal checks,
deposits, corporate tax returns, location of company, stock trading history, etc.)

3) The govt. statement to Judge Cooke that no other federal agency was involved in the
"investigation" is belied by the SEC's own press release of June 30, 2011, stating that in the
penny stock sting cases, the "SEC worked closely with the US Attorney's Office for the Southern
District of Florida and the FBI on the investigation." (See attached exhibit C.)

4) But if the govt. did not consult with the SEC, then when, and where, and from whom did the
govt. gets its information about my alleged "history of securities fraud", or that it "began as early
as 2004" when I "came to the attention of law enforcement"?   (See DE 185 excerpt below.)

would have permitted the government to introduce evidence to negate that defense. Simply put, the

Defendant cannot ask for a new trial, claiming that the jury verdict would have been different *but*

*for* the fact that he could not introduce certain evidence, and ignoring the evidence that this Court

would have permitted the government to introduce had the Defendant introduced that evidence [1]

    Fifth and finally, even on the eve of sentencing, the Defendant offers no evidence to negate

---

[1]    The Defendant makes a brief reference to materials in the possession of the SEC. As a
legal matter, the government does not have a constitutional duty to search for and disclose
information possessed by other federal or local agencies that are not involved in the investigation
or prosecution of the case. *See United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005) (no
*Brady* violation regarding documents collected by civil branch of Department of Labor, where
there was "no indication" that the Department and the prosecution "engaged in a joint
investigation or otherwise shared labor and resources," nor "any indication that the prosecution
had any sort of control over" the Department officials who collected the documents); *United
States v. Casas*, 356 F.3d 104, 115–16 (1st Cir. 2004); *United States v. Shryock*, 342 F.3d 948,
983–84 (9th Cir. 2003); *United States v. Velte*, 331 F.3d 673, 680 (9th Cir. 2003); *United States
v. Zavala*, 839 F.2d 523, 528 (9th Cir. 1998); *United States v. Morris*, 80 F.3d 1151, 1169 (7th
Cir. 1996); *United States v. Trevino*, 556 F.2d 1265, 1270–71 (5th Cir. 1977). In this case, the
SEC was not part of the prosecution team.

### (b) Direct Appeal of Ground FOUR

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2)   If you did not raise this issue in your direct appeal, explain why:

### (c)   Post-Conviction Proceedings:

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☑

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:   *N/A*

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):   *N/A*

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?   *N/A*

Yes ☐   No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐   No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   *N/A*

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

**GROUND FIVE:  My due process rights were further violated because no expert or other witnesses testified at trial on my behalf, in order to support the defenses raised on my behalf, including what is the definition of an "artificially inflated price".**

(Supporting facts.)

1) The term "artificially inflated price" is a phrase that has a precise, specialized meaning within the particular field of securities law.  The securities industry definition is relevant given that the sting targeted penny stocks exclusively, plus the SEC noted publicly that most defendants were charged for identical crimes civilly while announcing parallel criminal charges generated by the sting operation.

2) The term-of-art, "artificially inflated price" was cited throughout my indictment (DE 19) and thus became an essential element of the crimes for which I was charged -- both civilly and criminally as said above -- which the govt. presumably was required to prove beyond a reasonable doubt.

3) However, no expert securities witness testified on my behalf as to what "artificially inflated price" means in the securities industry

4) My sole defense -- and reason for going to trial -- was predicated on my belief that I had no intent to harm anyone, and that I did NOT sell stock to the fund for the dollars set by the fund's "fiduciary" at an "artificially inflated price.

5) It is not known to what extent my lawyer's decision to call no witnesses on my behalf influenced the jury, after he told them in opening remarks that we would call such an expert.

### (b) Direct Appeal of Ground FIVE

(1)  If you appealed from the judgment of conviction, did you raise this issue?
Yes ☐        No ☑

(2)  If you did not raise this issue in your direct appeal, explain why:


(c) **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?
Yes ☐        No ☑

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____ N/A

Name and location of the court where the motion or petition was filed:
_____

Docket or case number (if you know): _____

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available): N/A

Page 12-A
(please see page 12-A and 12-B)

GROUND SIX:   My due process rights were further violated because Agent Sputo's
testimony at my trial did not meet all the tests for admissibility under Federal Rule of
Evidence 807, and I did not receive  a continuance after we asked for one, to gather
necessary evidence to rebut the Agent's testimony.

(Supporting Facts)

1) The govt. introduced inadmissible evidence on last day of trial without properly disclosing
its intent to do so, to me and my counsel.   (See DE 153).

2) The evidence smeared me by giving the jury reason to believe that I used money, which
had been received by my company after the fictitious pension fund purchased stock for
personal reasons, for personal, selfish, greedy reasons, which the govt. then
repeated and emphasized in closing comments.

3) The indictment made no mention of misuse of funds, but even if it did, and even if the
testimony was not inadmissible, we were not given time to present evidence to show not only
that the Agent's testimony was in error, but it conflicted with data in the possession of the
SEC.

4) Please see our motions DE 150 and 153 for supporting facts and/or argument.

   (b) Direct Appeal of Ground SIXa

     (1)  If you appealed from the judgment of conviction, did you raise this issue:
       Yes ☐    No ☑
     (2)  If you did not raise this issue i your direct appeal, explain why:
       My appellate attorney wanted to focus on stronger appeal arguments

   (c)  Post conviction Proceedings:

     (1) Did you raise this issue in any post-conviction motion, petition, or application.
       Yes ☐      No ☑

     (2) If you answer to Question (c) (1) is "Yes" state:
       Type of motion:  Motion for New Trial Pursuant to Rule 33 and our response to
                  govt's reply (DE 150 and DE 153)

       Name of the Court where the motion was filed:     US District Court - So. District of
                                       Florida - Miami Division
       Docket or case number:  DE 150 (filed 6-26-12) and 153 (filed 7/12/12)

       Date of the court's decision:  Denied

(3)  Did you receive a hearing on your motion, petition, or application?

  Yes ☐    No ☑

(4)  Did you appeal from the denial of your motion, petition, or application?    N / A

  Yes ☐    No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

  Yes ☐    No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:    N / A

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):


   END OF MY (6) GROUNDS


13.  Is there any ground in this motion that you have not previously presented in some federal court? If so, which
     ground or grounds have not been presented, and state your reasons for not presenting them:

     Ground Two:  The govt. did not have reputable info before targeting me, despite telling the opposite to Judge
     Cooke.) My lawyer told me that I could appeal the Judge's denial of my pro se motion even after I was convicted,
     but my appellate lawyer (Tracy Dreispul) focused our appeal on other issues, while I was serving time in prison.

     Ground Three & Four: I was not able to ask questions at hearing on Apr 23, 2012, when it was suggested
     (apparently by the govt) that the judge should take up my motion at that time.  I did not learn this or see transcript
     until after being convicted at trial.  I learned later from news stories and from other trials the role played by SEC in
     the sting, and how the govt. and Epstein operated to secure 30 indictments for DOJ and SEC in Miami district.


14.  Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the
     you are challenging?        Yes ☐      No ☑

     If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
     issues raised.

AO 243 (Rev. 01/15)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a) At the preliminary hearing:
Miguel Caridad, Asst. Federal Public Defender, 150 W. Flagler St. -- Suite 1700, Miami, FL 33130

(b) At the arraignment and plea:
Represented by Federal Public Defender officer at arraignment, and by Miguel Caridad thereafter

(c) At the trial:
Miguel Caridad

(d) At sentencing:
Miguel Caridad

(e) On appeal:
Tracy Dreispul, Asst. Federal Public Defender, 150 W. Flagler St. -- Suite 1500, Miami, FL 33130

(f) In any post-conviction proceeding:
Tracy Dreispul

(g) On appeal from any ruling against you in a post-conviction proceeding:
Tracy Dreispul

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?   Yes ✔   No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes ☐   No ✔

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:
N / A

(b) Give the date the other sentence was imposed:  N / A

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

My 2255 motion is timely, it being filed on or before October 6, 2015, per the input from my appellate attorney, Ms. Tracy Dreispul (AFPD)

AO 243 (Rev. 01/15)

N/A

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255,
paragraph 6, provides in part that:
   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run
   from the latest of –
      (1)  the date on which the judgment of conviction became final;
      (2)  the date on which the impediment to making a motion created by governmental action in violation of
      the Constitution or laws of the United States is removed, if the movant was prevented from making such a
      motion by such governmental action;
      (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has
      been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral
      review; or
      (4)  the date on which the facts supporting the claim or claims presented could have been discovered
      through the exercise of due diligence.

AO 243 (Rev. 01/15)

*p. 15*

Therefore, movant asks that the Court grant the following relief:

Set aside my conviction based on one or more of the above five (5) grounds

or any other relief to which movant may be entitled.

N / A
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on                    10-5-15

(month, date, year)

Executed (signed) on                                   (date) *Oct 5, 2015*

*Oct 5, 2015*

Douglas Newton
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

*Signed again —
by: DNewt
10/5/15
+ mailed express
mail —*

Case 0:11-cr-60150-MGC   Document 239   Entered on FLSD Docket 10/07/2015   Page 19 of 95

SEC Charges Company CEOs and Penny Stock Promoters in Kickbac...

Re:  Oct 5, 2015 ~ 28 U.S.C. 2255 Motion
For Douglas Newton #96993-004

( E x h i b i t C )



## SEC Charges Company CEOs and Penny Stock Promoters in Kickback Schemes

### FOR IMMEDIATE RELEASE
### 2011-138

*Washington, D.C., June 30, 2011* — The Securities and Exchange Commission today filed securities fraud charges against several CEOs, their companies, and two penny stock promoters alleging they used kickbacks, a bribe and blast e-mails to manipulate trading in microcap stocks.

### Additional Materials

▸ Litigation Release No. 22018
▸ SEC Complaint vs. Thomas Schroepfer
▸ SEC Complaint vs. Donald W. Klein
▸ SEC Complaint vs. Brian Gibson
▸ SEC Complaint vs. Douglas Newton

The schemes were brought to light by an undercover operation by the Federal Bureau of Investigation, conducted in a way so that investors were not harmed. The SEC worked closely with the U.S. Attorney's Office for the Southern District of Florida and the FBI on the investigation, and the U.S. Attorney's Office announced parallel criminal charges Thursday against the same individuals named in the SEC's civil lawsuits.

According to the SEC's complaints, filed in U.S. District Court for the Southern District of Florida, most of the schemes involved kickbacks to a purportedly corrupt pension fund trustee in exchange for having the fund buy stock in microcap companies. Another scheme involved a bribe that was to be paid to a purportedly corrupt broker who agreed to buy microcap shares on behalf of investors with discretionary accounts. A final scheme involved a stock promoter who created a website to tout a penny stock company through a volley of e-mail blasts and who posted phony testimonials from fake investors.

What the insiders and promoters did not know was that the people who were counterparties to the illegal transactions were actually undercover FBI agents or confidential sources participating in an undercover operation. The latest charges follow a series of cases filed in October and December 2010, in which the SEC sued more than a dozen companies and penny stock promoters with similar stock manipulation schemes.

"Investors deserve better than secret investment strategies based on kickbacks and bribes," said Robert Khuzami, Director of the SEC's Division of Enforcement.  "As our charges make clear, these CEOs got more than they bargained for but exactly what they deserved for making illicit payments to manipulate microcap stocks."

Eric I. Bustillo, Director of the SEC's Miami Regional Office, added, "The defendants charged today were intent on making profits for themselves while defrauding others. The SEC will continue to aggressively pursue those who engage in microcap stock fraud schemes."

Named in the SEC's complaints are:

- **Douglas Newton**, of Rancho Mirage, Calif., the CEO of **Real American Brands, Inc. n/k/a Real American Capital Corp.,** paid kickbacks to a purported employee pension fund trustee to buy more than 6.2 million shares of restricted Real American Brands stock. Newton attempted to conceal the kickbacks by entering into a consulting agreement with a phony company that the trustee fabricated to receive the kickbacks. However, the corrupt trustee was a fictitious person, the trustee's business associate who helped arrange the deal was an undercover FBI agent, and the phony consulting company was actually created by the FBI.

- **Donald W. Klein**, of Frisco, Texas, the president and CEO of **KCM Holdings Corp.,** engaged in two restricted stock transactions and one market transaction involving KCM Holdings' stock. Klein and the company paid kickbacks to an undercover FBI agent who portrayed himself as a business associate of a corrupt trustee of an employee pension fund, in exchange for the fund's purchase of 2.5 million shares of restricted KCM Holdings stock. Klein attempted to conceal the kickbacks through a consulting agreement with a phony company that would receive the kickbacks. In another scheme, Klein bribed a purported corrupt stockbroker (actually an undercover FBI agent) to purchase KCM Holdings stock in the open market for brokerage clients with discretionary accounts.

- **Thomas Schroepfer a/k/a Thomas Schroepfer Baetsen,** of Las Vegas, Nev., the president and CEO of **SmokeFree Innotec, Inc.,** and **Charles Fuentes,** of Dana Point, Calif., a promoter of SmokeFree's stock, paid kickbacks to an undercover FBI agent, posing as the business associate of a corrupt employee pension fund trustee, in exchange for the fund's purchase of 400,000 shares of restricted SmokeFree stock. Schroepfer attempted to conceal the kickbacks through a consulting agreement with a phony company created to receive the kickbacks. In addition, SmokeFree issued shares of its stock to a cooperating witness for acting as a middleman in the scheme.

- **Brian Gibson**, of Coconut Creek, Fla., created a now-defunct website, Roaringpennystocks.com, to promote shares of **Xtreme Motorsports International, Inc.,** as part of a planned pump-and-dump scheme. Gibson touted Xtreme Motorsports by blasting a series of e-mails to potential investors and posted false testimonials on the site from purported investors raving about their success in following the website's stock picks.

The SEC alleges that the company officers and a promoter in most of the schemes understood they needed to disguise the kickbacks as payments to phony consulting companies, which they knew would perform no actual

work. The SEC alleges the individuals also knew that the purportedly corrupt fund trustee would be violating his fiduciary duty to his client by taking a kickback. In other instances, they knew that their illegal activities were meant to artificially inflate the companies' stock price.

The SEC's complaints allege the defendants violated Section 17(a) of the Securities Act of 1933, and/or Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. The SEC is seeking permanent injunctions and fines against all the defendants; disgorgement plus interest against the defendants who received ill-gotten gains; and penny stock bars against all the individual defendants.

Trisha D. Sindler, Michelle I. Bougdanos, and Chedly C. Dumornay investigated the case, and James M. Carlson is litigating the actions; all are with the SEC's Miami Regional Office. The SEC acknowledges the assistance and cooperation of the U.S. Attorney's Office for the Southern District of Florida and the Federal Bureau of Investigation, Miami Division, in investigating these matters.

# # #

For more information on microcap stock fraud, visit http://www.sec.gov /investor/pubs/microcapstock.htm

For more information about this enforcement action, contact:

Eric I. Bustillo, Regional Director
Glenn S. Gordon, Associate Regional Director
James M. Carlson, Senior Trial Counsel
SEC's Miami Regional Office
(305) 982-6300

*http://www.sec.gov/news/press/2011/2011-138.htm*

Home | Previous Page                                    Modified: 06/30/2011

EXHIBIT D.

Re:  Oct 5, 2015 --
28 U.S.C. 2255 Motion
For Douglas Newton
#96993-004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-60150-CR-COOKE(s)(s)

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

DOUGLAS NEWTON,

          Defendant.

_____/

## DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The defendant Douglas Newton, through undersigned counsel, and pursuant to Rule 33 of the Federal Rules of Criminal Procedure respectfully moves for a new trial and in support says:

Mr. Newton was convicted after jury trial on charges that he intended to defraud a pension fund in that he paid a kickback to the fiduciary of the fund in order to induce the fund to purchase stock in RLAB at an artificially inflated price. The court instructed the jury that in order to find Mr. Newton guilty they had to find that he intended to deceive or cheat the pensioners either for personal gain or to cause financial loss. The court instructed the jury that, "To act with intent to defraud means to act knowingly and with specific intent to deceive or cheat someone, usually for personal gain or to cause financial loss to someone else." The heart of the government's allegations and the basis of our defense concerned Mr. Newton's intentions, specifically whether he was acting with the intent to hurt the fund and or to bring personal gain to himself.

The evidence presented by the government's last witness Michael Sputo consisted of

improper hearsay testimony which was then used by the government in its closing argument to paint a picture of Mr. Newton as a greedy, selfish man who used the funds money for personal gain. We believe the introduction of this evidence was erroneous and that the government's use of the improperly admitted evidence denied Mr. Newton a fair trial.

The jury concluded that Mr. Newton had committed fraud and we believe this decision was due in large part to the testimony of the government's last witness-Special Agent Michael Sputo. He testified that the night before his testimony he had done some investigation which resulted in evidence concerning how Mr. Newton spent some of the money paid to him by the fund. Specifically, the agent testified that on the Sunday evening before he took the witness stand that he made a phone call to a club that had received checks from Mr. Newton and was told that it was a private golf club. He also checked some records and determined that the payees on some of the checks issued by Mr. Newton were the condominium homeowners association for Mr. Newton's home in addition to other companies such as the provider of cable television service. Finally, he testified that he reviewed other records and determined that another payee was a company that received rental payments for Mr. Newton's son's apartment.

The defendant objected to the introduction of this evidence on the grounds of hearsay. The court overruled the objection and allowed the witness to testify. During closing argument the government repeatedly stated that Mr. Newton had used the money received from the pension fund to make inappropriate payments for personal expenses. The defendant believes that the combination of the inadmissible hearsay and the government's prominent use of this evidence during closing argument denied Mr. Newton a fair trial. He asks the court to vacate the jury verdict and grant him a new trial.

2

The defense was surprised by this evidence and this argument. The indictment made no allegation that Mr. Newton improperly used any of the money received from the fund. The government only provided a copy of Mr. Newton's company's bank statements for the year 2009. Three of the payees in some of the checks included in these statements were the club, the condominium association and the company that collected the rent due on his son's apartment. The government did not produce any documentation verifying the results of the agent's last-minute investigation. Neither did the government inform the defendant that it intended to offer such proof at trial. Due to the surprise, the defendant asked the court to declare a mistrial or in the alternative to continue the trial so that he could investigate these allegations and present evidence to the jury that the money used to pay for each of the items were legitimate business expenses Had we had a continuance we would have also been able to prove that the money used to pay for each of the items cited by agent Sputo came from Mr. Newton's personal funds and from his mother's inheritance-a total of $65,000 of personal funds deposited into the company's bank account and used for legitimate business reasons . Importantly, we would have also been able to show that these legitimate business expenses could have been fully deducted from RLAB taxes but were not. The court denied both requests and the case continued to verdict.

Pursuant to Rule 33 a district court may grant a new trial when a defendant was unable to receive a fair trial and suffered compelling prejudice. *United States v. Pedrick*, 181F3d 1264 (11th Cir. 1999) A court's decision to grant a new trial will be reviewed for abuse of discretion. In this case Mr. Newton's right to a fair trial was prejudiced by the admission of hearsay evidence inserted into this trial without prior notice and without giving the defense opportunity to investigate the allegations and to present its own evidence. The testimony by agent Sputo consisted of information

3

that he received from either speaking to a third-party or reviewing documents. Also, such statements were offered for the truth of the matter asserted. For example, agent Sputo testified that he placed a call to a club in California and was told by the person on the other end of the phone that this was a private golf club. Such information was an out-of-court statement by the person on the other end of the phone offered for the truth of the matter asserted. The same hearsay problem infected the other two sources of information concerning the defendant's homeowners association and his son's apartment. No rule of evidence creates an exception to the hearsay rule which would allow the admission of such testimony.

     The hearsay problem was exacerbated by the government's prominent and frequent use of this evidence. The prosecutor more than once urged the jury to find that Mr. Newton had misused the money sent to RLAB by the pension fund. Apart from the fact that such allegation was not in the indictment and that no discovery documents were provided to verify the agent's testimony, the government repeatedly told the jury that Mr. Newton used the funds to play golf and pay other personal expenses. Such allegations based on hearsay evidence which the defendant did not have a reasonable opportunity to investigate, unfairly prejudiced Mr. Newton in the eyes of the jury. It was Mr. Newton's defense that he did not intend to defraud the fund but instead was working hard to make money for RLAB shareholders. The defendant did not have an opportunity to make it clear to this jury that Mr. Newton's expenses were business expenses related to RLAB. For these reasons, the defendant asks the court to vacate the jury verdict and grant him a new trial.

     At a new trial the defendant will be prepared to present the following evidence:

1) By 2009 RLAB's corporate offices had been moved to the defendant's home at 37 Lafayette Dr., Rancho Mirage, California in order to economize on office expenses. RLAB agreed to pay the

4

homeowner association fees and certain utilities at this address given that it was being used as the office for the company. Additionally, we would present testimony that Mr. Newton changed the configuration of his home at 37 Lafayette Dr. in Rancho Mirage, CA so that it could be utilized as the company's corporate offices and that over the years from 2008 to 2009 and beyond his home was used to hold numerous business meetings.

2) Mr. Newton had agreed to work for RLAB for an annual salary of $1 until the economy improved. He invested personal monies received from his mother's inheritance into the business. In the months before, during and shortly after the government's undercover operation from late December 2008 until May 2009, Mr. Newton personally received money from an inheritance, and from his brother and family which he then loaned to RLAB, and he borrowed money from his life insurance policy and loaned this to RLAB as well. This loan totaled $65,000. Thus, when Mr. Newton wrote some checks from the RLAB bank account,-for items which covered some personal as well as a few business obligations he used some of his own money which he had loaned to the company.

The defendant would also have been able to prove that RLAB did not expense or deduct from his tax returns as a business cost the checks he wrote for his son's apartment, or for the club, or for his cable TV, or homeowners association fee.

3) RLAB also agreed to pay for part of the cost of a one-bedroom apartment used by the defendant's son Chance Newton in consideration of Chance's agreement to continue to do RLAB's computer website and design work, to store product samples as well as inventory and business records, and to make deliveries of clothing samples and other materials as requested by RLAB.

4) RLAB agreed to pay the cost of maintaining the company's corporate business membership at the

5

club in Rancho Mirage which would be used by any all company personnel, clients, customers and business prospects. We would also present testimony s that Mr. Newton and others with an interest in RLAB made use of the corporate membership at the club by having lunches, business meetings and charitable functions in connection with and to promote the future of RLAB, Billy Martin's and Apocalypse Clothing Company.

This evidence will contradict the government's hearsay testimony and allegations made during closing argument that the defendant used the monies received from the pension fund for improper personal reasons. This evidence will allow the defendant to counter the unfair and untrue impression left by the government that Mr. Newton was a greedy self-serving man who did not care for the welfare of his company or shareholders and improperly used the fund's money for personal expenses. For these reasons Mr. Newton asks the court to grant him a new trial.

Respectfully submitted,

MICHAEL CARUSO
INTERIM FEDERAL PUBLIC DEFENDER

By: ____/s/ Miguel Caridad____
Miguel Caridad
Assistant Federal Public Defender
Florida Bar No. 0161380
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
(305) 530-7000/(305) 536-4559: Fax
Email: miguel_caridad@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 25, 2012, undersigned counsel electronically filed the

foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notice of Electronic Filing generated

by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized

to receive electronically Notice of Electronic Filing.

By:  /s/ Miguel Caridad
Miguel Caridad

### SERVICE LIST

United States of America v. DOUGLAS NEWTON
CASE NO. 11-60150-CR-COOKE/TURNOFF(s)(s)

United States Court, Southern District of Florida

**Miguel Caridad, AFPD**
150 West Flagler Street Suite 1700
Miami, Florida 33130
Tel. (305) 530-7000
Fax. (305) 536-4559
miguel_carad@fd.org

**H. Ron Davidson, AUSA**
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
Email: h.ron.davidson@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-60150-CR-COOKE(s)(s)

UNITED STATES OF AMERICA,

         Plaintiff,

vs.

DOUGLAS NEWTON,

         Defendant.

_____/

<u>NOTICE OF FILING PLEADING</u>

    The Federal Public Defender files the attached pleading prepared by the defendant and asks the court to consider it on its merits. The government objects to Mr. Newton's motion.

               Respectfully submitted,

               MICHAEL CARUSO
               INTERIM FEDERAL PUBLIC DEFENDER

               By:   /s/ Miguel Caridad
                    Miguel Caridad
                    Assistant Federal Public Defender
                    Florida Bar No.  0161380
                    150 W. Flagler Street, Suite 1700
                    Miami, Florida 33130-1556
                    (305) 530-7000/(305) 536-4559: Fax
                    Email: miguel_caridad@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2011, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By:_____ /s/ Miguel Caridad_____
Miguel Caridad

## SERVICE LIST

United States of America v. DOUGLAS NEWTON
CASE NO. 11-60150-CR-COOKE/TURNOFF(s)(s)

**Miguel Caridad, AFPD**
150 West Flagler Street Suite 1700
Miami, Florida 33130
Tel. (305) 530-7000
Fax. (305) 536-4559
miguel_cariad@fd.org

**H. Ron Davidson, AUSA**
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
Email: h.ron.davidson@usdoj.gov

I believe the conduct of the government's confidential informant and other personnel in their conception and execution of a reverse Sting Operation was so overreaching as to bar prosecution as a matter of due process of law, under the Fifth and Fourteenth Amendments of the US Constitution.   On these grounds, I move to dismiss this indictment.

## I.  QUESTIONS RAISED BY DEFENDANT

Specifically, I request that Judge Cooke consider the following:

1) Whether methods used in this Sting constituted an unjustified intrusion into citizens' privacy and autonomy running a risk that the activity would ensnare a innocent person who was otherwise minding his own business, and who was not disposed to cross over into the commission of crime but for the government's involvement.

2) Did the government manufacture a crime requiring vital  materials and  instruments, including the "fronting" of money to each defendant, essential to the crime's commission, which the defendants could not have provided or obtained on their own?

3) Were the method(s) employed by the government to ensnare the penny-stock defendants guided by a legitimate purpose -- namely to prevent crimes and protect the public -- or was the purpose to generate criminal charges insuring a prison term for as many defendants as possible?; and

4) Is the criminal enterprise which the government was presumably fighting -- and/or seeking to prevent-- a real crime, or one whose chances of occurring in the real world are "slim to none" at best?

## II.  BACKGROUND / FACTORS TO WEIGH IN CONSIDERING DUE PROCESS VIOLATIONS

In his book The Entrapment Defense (3rd Edition) Professor Paul Marcus writes "the rules with respect to the due process claim are difficult to state with precision . . . For many courts, the question ultimately becomes whether the government's involvement is shown to have been at a 'demonstrable level of outrageousness' or a level surpassing the limits of fundamental fairness." **(see United States v. Twigg).**
As to a definition of "outrageousness", some commentators have said "I'll know it when I see it".    Thus, trial courts look at the "totality of the circumstances" in determining if the government conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." **(United States v. Dota.)**
According to **United States v. Robinson**, among the factors to consider in evaluating a due process defense claim are: "the impetus of the scheme, the control the government exerted over the criminal enterprise, and the impact of the police activity on the commission of the crime."

The court in **United States v. Moore** discussed the problem this way:   "In determining whether police conduct has undermined constitutional due process protections, four (4) factors are considered:

   1)  the need for the type of government conduct in relationship to the criminal activity;
   2)  the pre-existence of a criminal enterprise;
   3)  the level of the direction or control of the criminal enterprise by the government; and
   4)  the impact of the government activity to create the commission of the criminal activity."

The New Jersey Supreme Court stated it somewhat differently:   "A determination of due process entrapment requires careful scrutiny of the government conduct in light of all the surrounding circumstances.   That scrutiny focuses on:

1) whether the government or the defendant was primarily responsible for creating and planning the crime,

2) whether the government or the defendant primarily controlled and directed the commission of the crime,

3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable. And

4) whether the government had a legitimate law enforcement purpose in bringing about the crime.'*

---

*For application of the multi-factor analysis, see State v. Nelson 822 P.2d 53, 58 (Kan. 1991); United States v. Payne, 962 F.2d 1228, 1231-32 (6th Cir. 1992, cert denied, 506 U.S. 909 (1992)

According to Ted. K. Yasuda (Note, 1982, Indiana Law Journal),  "the Third Circuit Court of Appeals' decision in **US v. Twigg** and the decision of a Third Circuit district court in **US v. Jannotti**" suggest "a more a workable and reasoned approach to an entrapment due process defense than a 'shocks-the-conscience' standard."

In Twigg, ". . . the court concluded that the government's tactics would not be justified as a means of detecting crime. Rather, the 'egregious conduct on the part of the government agents generated new crimes . . . merely for the sake of pressing criminal charges' and the court held such "overreaching" conduct to violate due process."

Yasuda observes that "a survey of recent cases reveals numerous questionable decisions, conflicting judicial pronouncements, and a largely affective mode of analysis that bars prosecution only if the government's involvement in or solicitation of crimes is perceived as 'outrageous'".
Yasuda further writes ". . . a due process analysis based solely on the outrageousness of the government's conduct provides no meaningful or definite standards for limiting governmental undercover activities conducted in the name of combating crime" Thus, he recommends " a more reasoned mode of analysis that has begun to emerge in recent decisions such as the district court's in **Jannotti**, upholding an entrapment-due process defense."

In US **v. Jannotti,** a district court for the Third Circuit interpreted **Twigg** as dealing with the "central theme. . . that, though predisposed, the defendants had in fact been induced to commit a crime they would not otherwise have been likely to commit."

According to Yasuda, "avoiding the shocks-the-conscience test, the Jannotti court overturned the convictions of city councilmen Schwartz and Jannotti notwithstanding the jury's determination that the defendants had taken bribes and had been predisposed to do so.

"The entrapment due process defense which emerges from **Twigg** and **Jannotti** combines elements of both the objective and subjective theories of entrapment.  The decisions weighed numerous factors, including

1) the nature of the defendants' predisposition and its reliability as an indicator of whether the crime would have been committed absent the government's involvement;_____

2) the defendants' prior criminal conduct and whether the defendants had been engaged in an on-going pattern of criminal activity;_____

3) the initiation of the crime by the government or defendants;_____

4) the government's provision of essential materials or services and the likelihood that the defendants could independently have obtained them from another source;___

5) the relative importance of the roles played by the government and the defendants in the offense;___

6) the difficulty of detecting the crime and the need for the tactics disclosed by the case._____

7) whether, objectively considered, the tactics adopted were calculated to overwhelm; and___

*8)* whether the record revealed   caution on the part of law enforcement officials to avoid the manufacturing of crime or disclosed simply a desire to obtain a conviction._____

"No one of the above factors was determinative; each was weighed in conjunction with the rest, the central inquiry remaining whether under the total circumstances the government's conduct was justified as limited to the detection of crime, rather than its promotion.

"The Twigg-Jannotti analysis possesses sufficient flexibility to safeguard the defendant's right to be free from government-created criminality, while respecting the real needs of law enforcement agents to resort to subterfuge to combat crime."

## III. RELEVANT FACTORS IN THE INSTANT CASE

Following are facts, circumstances and conclusions which warrant a further examination by the Judiciary in considering whether due process rights have been violated:

### 1) Were the methods employed by the government to ensnare me and others guided by a legitimate purpose?

Such a purpose should have been to stop, prevent or discourage actual crimes from occurring, and to do so, in order to protect the public.

In the instant case, there appears to be little or NO evidence showing the government's interest was to infiltrate an existing or on-going criminal enterprise, or that the planners sought to minimize or prevent such crimes from occurring in the future.

In fact, the criminal "activity" which the government was presumably fighting and/or seeking to prevent is actually "a crime" of which there has been very little if any instances reported in the annals of U.S. security law violations.

Few if any fiduciaries of established Pension Funds operating in America under ERISA rules, have been accused or convicted of taking kickbacks in exchange for their agreement to make illicit purchases of "restricted" shares of stock in a class of securities issued by a "non-reporting" public company that trades in the electronic market known as the "Pink Sheets".

Yet these were exactly the kind of entities which the Sting planners exclusively sought to target and convict after catching them in the midst of pursuing and committing such a crime.

There are rules governing ERISA-compliant pension funds making it highly implausible for fiduciaries -- even corrupt ones -- to invest pension monies in penny-stock companies, much less "non-reporting" ones; and is it ever more inconceivable the fiduciary would insist that the shares being bought from such an entity would be "restricted" shares to boot, *and* purchased at a price normally paid for "unrestricted" shares.
What this suggests is that the government's Sting scheme was NOT so much intended to "take a bite out of any actual crimes" being committed now, or likely to occur in the future.  Rather, it indicates that the Sting planners had as their primary purpose a different goal:  To wit, to ensnare as many officers of penny-stock companies as possible in order to produce cases and convictions for the government.

### 2) Was the government's goal the creation and promotion of new crime, based on a desire to obtain a *prison sentence* for each CEO caught in the Sting?

The government had the specific plan to provide the prosecution with ammunition such that each defendant would be subjected to a prison sentence of not less than 12 to 18 months.   One of the first statements the AUSA made to my attorney in Jan. 2011, was that each defendant captured in the Sting would receive "a taste of jail."

To accomplish this objective, the government "fronted" each CEO with two separate wire transfers -- occurring within 14-30 days of each other -- in denominations of $20K each.
Without such cash in hand, no CEO could commit the crime at issue;  namely, paying some of this money across state lines to the "consulting company" where some of it could then be kicked back to the corrupt fiduciary.

Phase 1 -- The size and timing of the "pension's" stock purchases were calibrated  so the US Attorney could subsequently charge that the amount of the intended pecuniary harm caused by each defendant's alleged crime would be at a sentencing level of "greater than $30,000".
In short, the two stock purchases -- adding up to more than $30K  --  would call for the imposition of a minimum charge of six (6) sentencing points, thereby all but insuring a category C or D sentencing level to be subsequently charged against each defendant
Since the pension did not really exist, and there could be no *actual* harm inflicted on non-existent "people", the loss amount charged by the government would be defined based on the government's contention as to what was the size of the defendant's *"intended"* or potential harm.

And since the government targeted only penny-stock companies, whose stocks are by definition speculative and risky -- according to numerous warnings published on the SEC's own website and on the Pink Sheets -- the government would be on solid ground when claiming later that pensioners whose fiduciary bought such stocks had to run a risk of losing their entire investment.

Hence, the Sting planners calculated that the size of the investors' *potential* loss, i.e., the potential pecuniary harm -- could be as high as the identical amount paid for the stock by their pension in the first place, namely at a level in excess of the government's threshold target, to wit: "greater than $30,000".
Phase 2 --  Once this prison term objective was achieved, the government planners sought to escalate charges against their targets by using a confidential informant (Epstein) and his purported business associate (actually an FBI agent named "Rob Scott") by proceeding to Phase 2 of their Sting scheme.
As laid out by Epstein, this consisted of a plan for me to illegally create new free-trading shares of stock in RLAB for which Epstein would give me $50,000, less 25%, or $12,000.    The smaller sum would be needed to help "incentivize" a few broker friends of Epstein and "Rob" who would begin purchasing RLAB stock in the open market "on behalf" of many of their wealthy and unwitting clients, whose trading accounts were controlled by their trusted brokers.

Unlike the stock sale to the Pension, which had no upward effect on RLAB's price in the open market, The Phase 2 plan would have entailed actual market price manipulation, putting $38K in my hands, while artificially driving up RLAB's stock price.   Rob and Epstein said this would benefit not only my current shareholders, but the very same "pensioners" who already held $40K "worth" of RLAB stock.
Despite their best efforts, I declined to participate in Phase 2, the purpose of which was the creation and promotion of new crimes by the government.

**3)  Did the planners use appropriate instruments and methods in order to facilitate the likelihood that the criminal activity would occur:   Without these items, would the crimes have been possible?**

As said above, the Sting planners used cash to prime the pump:  (To a micro-cap company, $20,000  was not an insignificant sum especially at the height of the economic downturn in late 2008/early 2009 when the Sting was conceived and launched.)

Other instruments included:

a) the government used a Limited Liability consulting company (named "Great Lakes Advisors, LLC") headed by a "very, very, very powerful" friend and business associate of Epstein's ("Rob Scott".) He was the same business associate whom Epstein previously referred to in *pre-sting* conversations with me when discussing my hopes to launch RLAB's new apparel line into test markets, carrying the trademark "Born & Bred in the USA."

b) the government also produced a Consulting Agreement and sample blank invoices containing Great Lakes' name.   "Rob" said they were the same as those signed by other penny-stock companies who used the consulting company.  Even though initial investments from the Pension started at $20,000, both Epstein and Rob said the Pension sometimes invested as much as $200,000 to $250,000 in a given penny stock company.    To begin, however, 30% of the $20,000 would need to be paid under the agreement with Great Lakes.

 c) the government also used an impressive looking SEC-compliant five page Subscription Agreement, from the Pension fund.   It called for my signature permitting the fund to immediately wire out the initial $20,000.  The document was purportedly already being used by the Pension for its investment in other penny-stock companies, calling for the purchase of "restricted" common stock, at a price set on the date the document was signed.

I understand now this instrument had the two fold objective of facilitating a CEO's  immediate issuance of the type of security requested by the Pension;  while producing evidence for the government to charge that I sold stock to the fund at an "inflated" price, by virtue of the fact that the shares requested by the Pension were "restricted".

d) "Rob" was also scripted to say he was "a mile wide and one inch deep" so don't expect him to actually do any real consulting work.   Thus, by my signing the Consulting Agreement with Great Lakes, and the Subscription document, the government could allege that a phony, deceptive document was employed to send an illegal kickback to a pension fiduciary in order induce the fraudulent purchase of stock in my company.

**4)  Does the record reveal that the government showed NO reading to prevent further crime or to protect the populace?_**

I do not know why the government waited so long before informing me, in Jan. 2011 me that I was "one of dozens of CEO's" caught in the Sting, approximately two years earlier in March 2009.
Was it because they wanted to protect the identity of their confidential informant?   They could   have found other ways to arrest me, and keep me from spreading news about their Sting, just as they had successfully kept Epstein's prior crimes secret during the 16 months he was working as their front man.
During this waiting period, the government did NOT consider the possibility that I could have issued a press release(s) disseminating news to the investing public across America from my small <u>retail</u> company, that a *major national* <u>retail</u> *chain* (this was the purported owner of the fund) had acquired literally millions of shares of RLAB stock for their own employees and retirees of their pension fund.

I could have released this news publicly at any time. It would have been big news and pushed RLAB's stock price higher.  Apparently, either the government assumed I would not release such news, or they were unconcerned, thus taking a real risk that a public company (RLAB) could disseminate untrue information, thus committing fraud on innocent people in the populace.

The 21 month wait:   The Sting planners probably waited to bring me in, in hopes of catching me committing  big crimes. I know they  encouraged me to commit new crimes:   They tried this, but to no avail, in late April 2009 when Epstein and Rob offered me $38,000 (in Phase 2.)
The also tried again in February 2010 -- ten months later --  when Epstein offered me $100,000 via a "pump and dump" program in the open market whereby Epstein would utilize a "Hispanic friend named Julio", who purportedly controlled the trading accounts of several wealthy investors living in Miami and South America.

**5) Did the Sting Planners follow correct procedures, including their use of the confidential informant under authority of the Attorney General, per 28 U.S.C. 509, 510. 533. et al?**

There is nothing illegal about using an informant whom the government is compensating, in order to induce the commission of a crime.

This is true even if the informant was Epstein, a multi-millionaire who had a prior business relationship with RLAB, and stood to gain a "contingent fee" from the government amounting to something more valuable than money, namely a reduced prison term for his crime(s).
It is uncontested that Epstein had an enormous incentive to lure and nab penny-stock personnel to both Phases of the government's Sting program.

After Epstein was charged with penny-stock securities fraud in 2008, the government obviously instructed him to refrain from any further trading in penny stocks;  he agreed to same as part of his cooperation deal. Prior to this time, Epstein was known to be a major investor in penny-stocks.  He also invested over $100,000 in my company in late 205/2006.

Nevertheless, during the same time he was working to help the government locate and fight penny-stock crimes and fraud in the US, Epstein continued to engage in a massive amount of penny stock trades, acquiring and most likely liquidating hundreds of millions of shares of reporting and non-reporting Penny stocks.

When confronted with this fact, Epstein originally lied to his FBI handler, but later admitted to same.
(Confirmation of this was obtained by me via Discovery in the form of an affidavit from Epstein's handler, according to which Epstein acknowledged producing hundreds of thousands of dollars in revenues for himself.   Despite lying to the FBI, as well as his other crime(s), Epstein received a sentence of probation. See attachment.)

Were the government's activities consistent with Attorney General guidelines governing the control and monitoring of the Sting and its undercover operations?   Did Epstein use any untrue representations to the government concerning his prior relationship with me -- or other innocent persons he was working to deliver to the Sting planners' net -- on the basis of which he targeted me, and was permitted to tape my phone conversations prior to luring me to his home in Florida on March 24, 2009?

Did Epstein provide any key service that would be reasonably unavailable to criminal actors but for the participation of the government?   I would not have spent three months preparing large amounts of materials for Epstein, or flying across country to Florida on March 24th had I not had prior confidence in him and in the truth of what he was telling me.

Extensive emails and phone calls took place during the 3-month "set up" period leading to March 24, 2009. So far, however, with my trial less than a week away,  not all of these emails have been located or produced by the government, and only a few taped phone calls have been provided.

## IV  In Conclusion

I believe the above factors should lead this court to dismiss this indictment.

It is hard to understand why is the pursuit and inducement of criminal conduct on the part of those not originally intending to commit a crime, especially an improbable one so totally manufactured and orchestrated by their government with the motive being to send those people to prison, is not "outrageous."

In the New York case, **People vs. Isaacson** (406 N.Y.S. 2d. 714 (N.Y. 1978), the court dealt with what judges construed as "reprehensible police action" and began its discussion by finding that the New York state constitution imposed higher standards than those set forth by the US Supreme Court, tracing the rationale for the due process clause as follows:

"It has been said that 'due process' unlike some legal rules is not a technical conception with a fixed content unrelated to time, place circumstances.  It embraces fundamental rights and immutable principles of justice, and use of the term is but another way of saying that every person's right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice .
. .

"Due process of law guarantees respect for personal immunities "so rooted in the tradition and conscience of our people as to be ranked as fundamental.  It imposes upon courts the duty to foster "that fundamental fairness essential to the very concept of justice."

* * *

## AFFIDAVIT

I, Michael Sputo, being duly sworn, deposes and states:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Miami, Florida Field Office. I have been employed as a special agent for over 24 years. For my entire career, I have worked principally on investigations involving white collar crimes, including securities frauds. Over the years, I have worked with numerous cooperating witnesses in undercover operations.

2.  In March 2009, Richard Epstein began cooperating in an undercover capacity with the FBI. I was Mr. Epstein's primary handler and spent numerous hours with him while he was cooperating. I interacted with him on an almost daily basis. Between March 2009 and August 2010, Epstein recorded over 1000 telephone conversations and over 40 in-person meetings. To date, Epstein's recordings have been integral to charges for fifteen individuals (including approximately ten guilty pleas) and are expected to lead to charges involving up to as many as fifteen more.

3.  During his cooperation, Epstein was instructed, and agreed, to refrain from any further trading in penny stocks. In approximately February 2011, I learned from a source that Epstein had, in fact, continued to trade in penny stocks. When I initially confronted Epstein about this trading, he falsely denied it. Epstein had also falsely denied any such trading in the prior months before we had obtained evidence to the contrary. Subsequently, Epstein acknowledged that he had violated his instructions and apologized for lying to me. As a result of Epstein's conduct, the FBI ceased using him in his undercover capacity. We did discuss, however, possibly having Epstein sit in on a meeting in June 2011 where he would not be required to be the undercover witness, but we ultimately did not go forward with the meeting.

4.  It is my view that, prior to his dishonest conduct, Epstein was an outstanding cooperator and I believe that he should still receive credit for his cooperation. Epstein's improper trading and subsequent lying, however, was a very serious violation of his agreement and should impact the amount of credit he receives. In fact, Epstein lied to me and other agents for months by denying that he was trading in penny stocks, the very type of stocks that he had pleaded guilty to manipulating and which we were currently investigating other schemes. As a result, his value as a witness has been diminished.

5.  I also believe that a jail sentence is appropriate to reflect the seriousness of his crime, properly credits the overall value of his cooperation, and because, having spent significant time with Epstein, it is clear to me that anything short of prison

1

will fail to deliver the proper message to him: that his pattern of deceitful conduct
must have real consequences.

MICHAEL SPUTO
Special Agent
Federal Bureau of Investigation

2

FD-302 (Rev. 10-6-95)

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/18/2011

Michele Epstein (protect identity) provided the following information:

On 2/11/11, SA Michael Sputo telephonically contacted Epstein, and asked Epstein when he had last spoken with Sameer (LNU), and he replied that they had spoken that morning. When asked what they spoke about, Epstein said stock deals. Epstein was asked if he had done any recent stock deals with Sameer, and he said no, that they discussed old deals on which Sameer owed him money. Epstein said that he had not done any new stock deals with Sameer in months.

Epstein was then told that SA Sputo had information that Epstein was continuing to trade stocks with Sameer. Epstein denied that he continued to do stock deals after being told by the FBI not to trade penny stocks. Epstein was told that he should call his attorney and have his attorney call SA Sputo.

A few minutes later, Epstein called SA Sputo and said that he wanted to apologize for lying to SA Sputo. Epstein then said that he had continued to trade penny stocks with Sameer after being instructed by the FBI to stop trading penny stocks. When asked why, Epstein said he needed the money. Epstein was again told to stop trading penny stocks.

On 2/16/11, at the request of SA Sputo, Epstein emailed to SA Sputo a typed summary of penny stock trading he did after being instructed not to do so by the FBI.

Investigation on   02/11,16/2011   at   Miami, Florida

File #   318C-MM-110810                                     Date dictated

by   SA Michael Sputo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

During the period from the end of March 2010 thru mid June 2010 I was involved in liquidating positions from my own accounts and from accounts controlled by Sameer Hirji. These were positions acquired by buying shares from the companies at a discounted price to the market. These positions were bought on a 50/50 basis between Hirji and myself and we shared in the proceeds equally. These include:

ITOKK, Inc. (IKTO)

Alternative Green Technology (AGTI)

Black Dragon Resources (BDGR)

International Merchant Advisors (IMAI)

The Football Network (TFBN)

The only position that was added to during that time were shares in BDGR which had been owed to us and cleared mid June 2010 and sold between 6/14/2010 and 7/15/2010 in one of Hirji's accounts thru Penson Financial.

After the above period over the next few months I entered into 3 additional "penny stock" deals with Sameer Hirji. The first was in My Freight World Technologies (MYFT). This was a 504 offering presented to Hirji who asked if I wanted to participate, which I did do. The total investment was approx. $25,000 between the 2 of us made in mid November 2010 for approx. 988,000 shares and was sold over the next 3 weeks for a total of approx. $26,930.00 to be split between the 2 of us.

The 2nd deal bought was in First Global Financial Corp (FGBF). This was a deal brought to Hirji and myself in of January 2011. It was the purchase of 1,666,667 shares of stock for $25,000.00. The stock was being sold by Omega LLC, a third party non affiliate we were told. A stock certificate was received by Oppenheimer for 1,579,571 shares to go into Hirji's account. In order to have the stock cleared the brokerage firm wanted more information from the seller regarding the "geneology" of the stock and was in contact with the seller for additional information. It took about 2 weeks for all the information to be received and processed at which time the stock cleared and Hirji started to sell. The original agreement called for the stock to be paid for the day after it clears. When the funds were ready to be sent Hirji was notified that the certificate was stopped. At that point the price per share was higher and in order to resolve the issue and so not to be bought in by Oppenheimer we were forced to pay $126,365.68 for the shares. I paid my 50% of the deal and have not received any funds in return.

The third deal I entered into was a continuation of my involvement with Camelot Entertainment Group (CMGR). This started in December '09. This was a deal brought to me in the beginning by Adam Reznikoff who I believe is a consultant for Camelot. The ongoing deal involved buying the convertible debt held by the NIR Group of companies. This was all aged debt as it was bought. The concept behind it for Camelot was that over a period of time as this debt became aged it would be bought from NIR so that they would stop converting their debt into shares and destroy the market price for Camelot shares. Conceptually it would be sold to someone who would convert the debt but not "slam" the shares into the market. The conversions of a particular note would be for 4.9% of the outstanding number of shares and the stock would be sent into Hirji's account thru Penson Financial. I do not remember the exact amount or have copies of any agreements made between Hirji and NIR/Camelot for our first transactions in Dec/09. Although I do not have the exact amount, I believe my investment was between $20,000.00 and $25,000. I believe I received about $32,500 from the initial transactions which included sales thru February 2010.

The next series of notes were purchased beginning in July 2010. The first note, dated July 21, 2010 was for $34,800.00. That was done equally by Hirji and myself with the stock being deposited as it was converted into Hirji's account. I have a copy of that convertible note purchase agreement, an attorney opinion letter addressed to the transfer agent, Transfer Online, Inc. referencing that note, and a sample of a signed notice of conversion and a copy of a Rule 144(b)(1) Seller's representation letter for the depositing of the shares, all of which I will be glad to supply you with. During the next few months ending in mid October we purchased approx. $400,000.00 in notes which we funded equally. Since July, 2010 I have received approx. $234,000.00 in proceeds from the sale of the convertible debt. I believe there is approx. an additional $100,000.00 left on existing notes to be converted that Hirji holds.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-60150-CR-COOKE(s)(s)


UNITED STATES OF AMERICA,

        Plaintiff,

vs.

DOUGLAS NEWTON,

        Defendant.

_____/

## DEFENDANT'S RESPONSE TO GOVERNMENT'S
## REPLY TO MOTION FOR NEW TRIAL

    The defendant Douglas Newton, through undersigned counsel, respectfully responds to the government's reply to his motion for new trial and in support says:

### Lay opinion?

    The government first replies that agent Sputo's testimony was permissible lay opinion admissible under the residual clause of the hearsay rules.  The government is incorrect.  Agents Sputo's testimony was never offered as an opinion about anything.  He did not give any opinion as to how Mr. Newton had spent the money. The questions posed to him were not phrased in terms of his opinion nor was the defense objection met with a reply that the agent was simply giving a lay opinion.

The government cannot now argue a basis for the admission of this evidence that it did not make in open court at the time that our objection was made. The government has waived any argument that this testimony was admissible under rule 701 of the Federal Rules of Evidence governing lay opinion.

In any case, agent Sputo only testified about what was told to him by someone or he presented the results of computer search of a database of information. For example, he testified that he did some research about Morningside club, obtained a phone number, made a call, spoke to some unidentified person who picked up the phone and relayed to the jury what that person told him. That is rank hearsay and not an opinion of any kind.

### Residual hearsay brought up for the first time now.

Neither can the government attempt to defend this evidence on the grounds that it was admissible as residual hearsay. Again, the government has waived this argument because it never raised it as a basis for admissibility. It is simply unfair for the government to argue months after the case is over that it intended to offer this evidence under the residual hearsay clause when it made no such claim at the time when the defendant and the court were struggling over this issue.

But even if the government had argued at trial that the evidence was admissible under the residual hearsay exception embodied in Federal Rule of Evidence 807, it

could not have met all of the tests for admissibility under that rule.  The rule reads as

follows:

**(a) In General.**  Under the following circumstances, a hearsay statement is not
excluded by the rule against hearsay even if the statement is not specifically
covered by a hearsay exception in Rule 803 or 804:

**(1)**   the statement has equivalent circumstantial guarantees of trustworthiness;

**(2)**   it is offered as evidence of a material fact;

**(3)**   it is more probative on the point for which it is offered than any other
evidence that the proponent can obtain through reasonable efforts; and

**(4)**   admitting it will best serve the purposes of these rules and the interests of
justice.

First, the statements must have equivalent circumstantial guarantees of

trustworthiness.  Agent Sputo testified that he obtained each piece of information

from either an anonymous person or some database.  Little else was proffered about

the source of this information to show that it had circumstantial guarantees of

trustworthiness similar to other hearsay exceptions.

Neither can the government meet the third requirement of the rule which is that

the evidence must be more probative on the point for which it is offered than any

other evidenced that the proponents could have obtained through reasonable efforts.

The government had months, months to obtain this evidence and made no efforts, not

to mention reasonable efforts, to offer it through non-hearsay means.  For example,

it could have subpoenaed someone from the Morningside club to testify in court

3

about the nature of the club and Mr. Newton's membership. The reason it did not do this is now clear. The government decided to introduce this evidence on the last day of trial and obtained the evidence only the night before. A truly reasonable effort would have been an investigation conducted months before and then, if and only if the efforts have been fruitless, could the government properly rely on the residual hearsay exception.

Neither can the government satisfy the fourth requirement which is that admission of the evidence will best serve the purposes of the rules of evidence and the interests of justice. How can the Justice Department possibly argue that admission of such hastily obtained evidence would best serve the interests of the purposes of the rules of evidence and justice? It would have been in the interests of justice for the government to have diligently gathered evidence in the many months that this case was pending and not surprised the defendant at the last minute with its last witness with hearsay testimony.

## **Trial by ambush**

The government's failure to gather this evidence months before trial and properly disclose it to the defendant also strikes a blow to the government's argument that we should somehow have anticipated this evidence. The government didn't even anticipate using it until the Sunday before trial reconvened on Monday. If the

4

government did not even think of using this evidence until then how can the defense possibly have anticipated it?  The record is clear that the only evidence presented to the defendant on these issues was bank records which showed that the payees on some of the checks issued by Mr. Newton was an entity called Morningside, a company called Braun Real Estate and an entity called Springs Homeowners Association with an accompanying memo note containing the defendant's address. (Exhibits attached) Every other piece of evidence concerning the payees was offered through the hearsay statements brought to court by agent Sputo.

There is no way anyone could have anticipated that agent Sputo would have testified that these payments concerned a country club, the defendant's condominium association and the company that collected rent for his son's apartment.  The indictment made no such allegation of misuse of funds, the government never informed counsel they would offer such testimony and the discovery did not include any other document which would have shed any light on the document.  And such evidence prosecution theory was not part of the government's opening statement.

But now we know that the reason for this lack of notice is simply that the government did not know it would be using this evidence.  The record clearly establishes that on Sunday evening the agent gathered this information by making some phone calls and doing some research on the computer and that this evidence

was presented the next day to the jury. This was trial by ambush based on hearsay.

Once we realized what the government was up to we objected to the evidence, cross examined the agent as best we could and asked for a continuance so that we could gather the necessary evidence to bring the court. The government opposed a continuance and the court denied our motion. The government would have had us act in the hasty manner that it did--last-minute scrambling to present incomplete and inadmissible evidence. Instead, we chose not to proceed that way and should not be punished for it.

The government, however, does seek to punish us by saying that during the cross examination we asked questions that allowed even more hearsay statements and evidence. The defense is puzzled as to whether the government is saying we did too little or did too much. Did we do too little by not presenting evidence at the last minute or did we do too much by challenging as best we could Agent Sputo during cross examination? From the defendant's point of view, whatever we did or failed to do was caused by the government's last-minute desperate attempt to smear Mr. Newton with inadmissible evidence.

The government also argues that this evidence was not very important. But this simply begs the question as to why the government thought that the course of the trial up to that point required a last-minute desperate effort by its case agents to obtain

evidence he should have obtained months before?  f the evidence was not that important, why send the agent on an  investigative chase the Sunday before the day he testified? The government's argument is further belied by the fact the prosecutor led off his closing argument with references to the way that Mr. Newton used the money and repeated these allegations throughout his closing argument accusing Mr. Newton of diverting the fund's money for personal use.  We believe the prosecutor highlighted these payments because, despite the fact that Mr. Newton admitted to agreeing to pay 30% of the dollar amount of the stock purchase to the fiduciary and his representative Rob, the undercover tapes show that both Mr. Newton and Mr. Skwara repeatedly told the undercover agent and the fiduciary that they were going to work hard to make their business grow and thereby increase the value of the shares of the companies owned by the fund.  This is why the government at the last minute felt it necessary to present the jury with hastily obtained hearsay evidence that Mr. Newton was not acting to increase the value of RLAB but instead used the fund's money for personal expenses.  Once having highlighted the importance of this evidence in its closing argument the government can now not be heard to minimize its impact.

Finally, the government alleges that we have not presented any actual evidence to this court in support of her motion for new trial.  We are prepared to present actual

evidence to back up the proffer we made in our motion for new trial and we will do

so if the court convenes a hearing.   Before that hearing we will do what the

government did not do.  We will provide any documents we intend to offer. At the

hearing we will offer proper non hearsay testimony.

MICHAEL CARUSO
INTERIM FEDERAL PUBLIC DEFENDER


By:    /s/ Miguel Caridad
      Miguel Caridad
      Assistant Federal Public Defender
      Florida Bar No.  384021
      150 W. Flagler Street, Suite 1700
      Miami, Florida 33130-1556
      (305) 530-7000
      (305) 536-4559: Fax
      Email: miguel_caridad@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 12, 2012, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By:_____/s/ Miguel Caridad_____
Miguel Caridad

## SERVICE LIST
## United States of America v. DOUGLAS NEWTON
## CASE NO. 11-60150-CR-COOKE/TURNOFF(s)(s)
United States Court, Southern District of Florida

**Miguel Caridad, AFPD**
150 West Flagler Street Suite 1700
Miami, Florida 33130
Tel. (305) 530-7000
Fax. (305) 536-4559
miguel_cariad@fd.org

**H. Ron Davidson, AUSA**
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
Email: h.ron.davidson@usdoj.gov



**BILLY MARTIN'S USA, INC.**
8806 SUNSET BLVD.  310-289-5000
LOS ANGELES, CA  90069

9833

DATE 2·15·09

PAY TO THE ORDER OF  Springs Homeowner Assoc.    $ 755.⁰⁰

Seven hundred Fifty five  ——00/——  DOLLARS

**UNION BANK OF CALIFORNIA**

FOR  77 Lafayette  Newport #16

⑈009833⑈ ⑆122000496⑆ 3250009797⑈

PostngDate: 20090219
AccountNum: 3250009797
Serial: 9833
Amount: 755.00
DIN (Posting Reference # or Seq #): 4020365

PostngDate: 20090219
AccountNum: 3250009797
Serial: 9833
Amount: 755.00
DIN (Posting Reference # or Seq #): 4020365

BILLY MARTIN'S USA, INC.                                          9830
9505 SUNSET BLVD.  310-289-5000
LOS ANGELES, CA  90069

# 1403

DATE  2-5-09

PAY TO THE ORDER OF  MORNINGSIDE                    $ 1079. ºº

One thousand Seventy Nine + ºº/—                    DOLLARS

UNION BANK OF CALIFORNIA

FOR  1403                                           Jag Neat

⑆009830⑆ ⑆122000496⑆ 3250009797⑆ ⑆0000107900⑆

PostngDate: 20090217
AccountNum: 3250009797
Serial: 9830
Amount: 1,079.00
DIN (Posting Reference # or Seq #): 2843122

02132009
POO#E447065 9        >066009650<
Las Angeles, Ca. 90071    Northern Trust, NA

0225706265

PAY TO THE ORDER OF
NORTHERN TRUST BANK
OF CALIFORNIA N.A.

PostngDate: 20090217
AccountNum: 3250009797
Serial: 9830
Amount: 1,079.00
DIN (Posting Reference # or Seq #): 2843122

**BILLY MARTIN'S USA, INC.**
8606 SUNSET BLVD.  310-289-5000
LOS ANGELES, CA 90069

9515

DATE 02/01/09

PAY TO THE ORDER OF  Braun Real Estate  | $ 850.00

eight Hundred Fifty 6/00  DOLLARS

**UNION BANK OF CALIFORNIA**

FOR 14th Grannys St MB

⑈009515⑈  ⑆122000496⑆  3250009797⑈  ⑆0000085000⑆

PostngDate: 20090210
AccountNum: 3250009797
Serial: 9515
Amount: 850.00
DIN (Posting Reference # or Seq #): 4249023

PAY TO THE ORDER OF
BANK OF AMERICA
STUDIO CITY, CA 91604
FOR DEPOSIT ONLY
BRAUN REAL ESTATE
1240781416S

PostngDate: 20090210
AccountNum: 3250009797
Serial: 9515
Amount: 850.00
DIN (Posting Reference # or Seq #): 4249023

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 11-60150-CR-MGC

UNITED STATES OF AMERICA,

        **Plaintiff,**

DOUGLAS NEWTON,

        **Defendant.**

_____/

## RENEWED MOTION FOR BOND PENDING APPEAL
## IN LIGHT OF CHANGED CIRCUMSTANCES

      The defendant Douglas Newton, by and through the undersigned counsel and pursuant to Title 18 U.S.C. § 3143, Fed. R. App. P. 9(b), respectfully brings this renewed motion for bond pending appeal in light of changed circumstances. Specifically, Mr. Newton brings this motion in light of the fact that his appeal has been scheduled for oral argument before the Court of Appeals during Februrary, 2014. In support of his motion, Mr. Newton states:

      1.     Mr. Newton was charged with mail and securities fraud based on his agreement, in a sting operation, to pay kickbacks to the fiduciary of a fictitious pension fund in exchange for investment in Newton's company. Mr. Newton made an initial appearance in court on July 20, 2011. He was released on a $150,000 personal surety bond and allowed to live at his home in California.

      2.     On May 9, 2012, he was convicted after jury trial. The Court allowed him to remain on bond pending sentencing but increased the bond to require that he post $1000 with the Court.

      3.     On November 9, 2012, the Court sentenced Mr. Newton to 30 months incarceration, imposed a fine of $2000, and an assessment of $700. DE 199. The Court allowed him to voluntarily surrender on January 9, 2013. DE 205 at 86.

4.      Mr. Newton complied with all bond conditions and voluntarily surrendered as directed.

5.      On December 6, 2012, Mr. Newton filed a Motion for Bond Pending Appeal, which was opposed by the United States.  DE 206, 208.  On December 20, 2012, the Court denied Mr. Newton's Motion for Bond Pending Appeal.  DE 212.  Mr. Newton filed a motion to reconsider, and/or for a statement of reasons, which was denied.  DE 214, 216.

6.      Mr. Newton now brings this renewed motion in light of the fact that his appeal has been scheduled for oral argument before the United States Court of Appeals for the Eleventh Circuit. The oral argument will take place during the week of February 24, 2014.

7.      As discussed below, the fact that Mr. Newton's appeal has been placed on the oral argument calendar confirms that his case presents "substantial questions of law and fact," that merit the granting of an appellate bond.

8.      Moreover, without a bond, Mr. Newton may end up serving all or more of the time he would otherwise serve if he is successful on appeal.

9.      This Court retains jurisdiction to grant Mr. Newton a bond even though his appeal is pending before the Eleventh Circuit. *See United States v. Bowdach*, 561 F.2d 1160, 1187 n.2 (5th Cir. 1977) ("we hold that the district court had jurisdiction to grant, modify and revoke the defendant's appeal bond").

10.     Wherefore, Mr. Newton brings this renewed request for bond pending appeal.

11.     The government opposes this request.

2

### Memorandum of Law

Title 18, U.S.C. § 3143(b) states, in pertinent part:

[T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, *unless* the judicial officer finds –

(A)      by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)      that the appeal is not for the purpose of delay and *raises a substantial question of law or fact* likely to result in –

      (i)       reversal
      (ii)      an order for a new trial,
      (iii)     a sentence that does not include a term of imprisonment, or
      (iv)      a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer *shall* order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in paragraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

18 U.S.C. § 3143(b)(1) (emphasis added).

Thus, to establish his entitlement to an appellate bond, Mr. Newton must show (a) that he is not likely to flee or pose a danger to any person in the community, and (b) that the appeal raises a substantial question of law or fact that is likely to result in a reversal or "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." *Id.* Mr. Newton can establish both criteria.

3

A.    Mr. Newton's appeal raises substantial questions of law and fact.

To address the more complex issue first, it is now clear that Mr. Newton's appeal raises one or more "substantial question of law or fact" that is likely to result in reversal or a reduced sentence. *See* 18 U.S.C. § 3143(b)(1)(B)(i), (iv). The Eleventh Circuit has defined a "substantial question" as one having "more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985).

It is not necessary for the Court to agree that it erred in order to find that a bond is merited. The Eleventh Circuit has recognized that "Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error." *Giancola*, 754 F.2d at 900 (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). The Eleventh Circuit was "unwilling to attribute to Congress the intention to deny bail pending appeal unless a district court judge found that he or she had committed error but was obstinately unwilling to grant a new trial or other relief to correct the error." *Giancola,* 754 F.2d at 900.

Hence, the Court need not find that Mr. Newton will necessarily prevail on appeal in order to find that he has raised a substantial question within the meaning of the statute. Instead, "[t]he inquiry focuses on whether 'responsible and conscientious counsel pose some problems that on this record are not free from doubt.'" *United States v. Price*, 611 F. Supp. 502, 504-05 (S.D. Fla. 1985). *See also United States v. Hall*, 765 F. Supp. 1494, 1497 (S.D. Fla. 1991) (granting bond pending appeal due to substantial Fourth and Sixth Amendment issues); *United States v. Hicks*, 611 F. Supp.

4

497, 498-501 (S.D. Fla. 1985) (granting motion for bond pending appeal based upon Sixth Amendment issue).

Mr. Newton's case has now been set for oral argument before the United States Court of Appeals for the Eleventh Circuit. The court's website indicates that "[a]pproximately three-fourths of the court's cases are decided on the briefs submitted by the parties," without oral argument. *See* http://www.ca11.uscourts.gov/about/index.php ("About the Court," accessed Oct. 21, 2103). The fact that Mr. Newton's case has been scheduled for oral argument -- something obtained in only 25% of appeals -- demonstrates that Mr. Newton has raised substantial questions of law and fact, that "very well could be decided" in his favor.

Mr. Newton has raised five issues on appeal, two relating to sentencing and three relating to the trial.[1]  For present purposes, he will focus only on the sentencing issues. If Mr. Newton prevails on either or both of these issues, then his guidelines would be reduced "to a term of imprisonment," which may result in a sentence "less than the total of the time already served plus the expected

---

[1] Mr. Newton's brief raises the following five issues:

    i.    Whether the court erred by refusing to consider the market value of the securities in assessing loss and by holding Mr. Newton accountable for a transaction with respect to which he had no agreement;

    ii.    Whether the court erred by imposing a position of trust enhancement where Mr. Newton had no relationship with the victims;

    iii.    Whether Mr. Newton's convictions must be vacated because the government failed to prove the offenses charged in the indictment and encouraged the jury to convict on alternate grounds;

    iv.    Whether Mr. Newton's conviction on count seven must be vacated because the sole coconspirator testified that he had no agreement with Mr. Newton regarding that transaction; and

    v.    Whether the cumulative effect of trial errors deprived Mr. Newton of a fair trial.

duration of the appeal process." 18 U.S.C. 18, U.S.C. § 3143(b)(1)(B)(iv). Wherefore, as the statute

recognizes, it is appropriate to grant a bond.

1.      **The loss amount should have been reduced by the actual value of the restricted stock.**

As argued at pages 26-32 of Mr. Newton's initial brief, the loss calculation was erroneous

because it should have been reduced by the actual value of the restricted stock sold to the fictitious

pension fund. *See* Corrected Brief of the Appellant Douglas Newton ("App. Br.") 26-28, *United

States v. Newton*, No. 12-16001 (11th Cir. Apr. 9, 2013).   There was no actual loss in this case,

because the there was never any decrease in the actual value of the stock purchased by the fictitious

pension fund in the sting operation. *See* DE205:38 (argument of defense counsel at sentencing that,

according to the data provided by the government, the purchase price of both USFM and RLAB was

equivalent or sometimes higher).

The government's theory of the prosecution was that the fictitious pension fund had suffered

loss because it overpaid for the stock in the first instance. Both the government and the defendant

had experts available to testify as to the value of the stock based on the government's theory.

However, the Court found that the entire value of the stock was loss because transaction should

never have happened.

This loss calculation was contrary to Eleventh Circuit precedent rejecting the notion that the

gross amount of a fraud may be considered "loss," where it is possible to assess an actual value to

the transaction. *See United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) (vacating sentence

where the district court used the entire gross proceeds of fraudulently-procured  contracts as loss

without reducing the amount by the value of services rendered); *United States v. Medina*, 485 F.3d

6

1291, 1304 (11th Cir. 2007)  (vacating sentence where the district court used the entire amount Medicare paid out in claims as loss, where there was insufficient evidence that the claims were not medically necessary).  *See also United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002) (holding that district court erred in determining that calculating loss to victims was not feasible and substituting intended gain for loss amount).

As an alternative theory of loss, the prosecutor argued that, "as a general rule of number, the restricted shares we got were about worth half of the amount of free trading shares." DE205:19. This would lead to a loss amount $40,000, which would have result in a two-level reduction to Mr. Newton's guidelines range.  As explained further *infra*, such a sentence would render Mr. Newton eligible for release to a half-way house, in the discretion of the Bureau of Prisons, at or about the time of the oral argument in this case. *See* U.S.S.G. § 2B1.1(b)(1)(D).  Mr. Newton believes, based on the proffered testimony of his expert, Dr. Pomerantz, that the loss amount was zero.  *See* DE205:26-38 (proffer and *voir dire* of testimony from Mr. Newton's expert, Dr. Pomerantz); DE215-1 (Pomerantz affidavit).  If this is correct, than he has already served more time in prison than required by the Guidelines (12-18 months, Zone C, eligible for split sentence).

Notably, Mr. Newton has not asked the Eleventh Circuit to substitute its own determination of loss for that of this Court.   Rather, he has requested that the sentence be vacated and that he afforded a new sentencing hearing where both sides may present evidence regarding the loss calculation.   Under either theory, however, a bond pending the remainder of the appeal process is appropriate.

2.      **The abuse of trust enhancement should not apply where Mr. Newton did**
        **not hold a fiduciary relationship with the victims of the offense.**

There is also a significant issue was to whether the abuse of trust enhancement should have

been applied in this case.  "A relationship of trust between the defendant and the victim is the *sine*

*qua non* of the abuse of trust enhancement." *United States v. Ghertler,* 605 F.3d 1256, 1264 (11th

Cir. 2010) (citation omitted).  *See also United States v. Garrison*, 133 F.3d 831, 839 (11th Cir. 1998)

("the abuse of trust enhancement applies only where *the defendant has abused discretionary*

*authority entrusted to the defendant by the victim* . . . '") (footnote and citation omitted) (emphasis

supplied by Court);  *United States v. Hall*, 349 F.3d 1320, 1324 (11th Cir. 2003) ("we must focus

on the relationship between Hall and the victims from the perspective of the victims").

Significantly, the government has conceded that Mr. Newton had no relationship with the

fictitious pension fund beneficiaries, who were the victims of this offense. *See* Brief for the United

States ("Gov. Br.") 67, *United States v. Newton*, No. 12-16001 (11th Cir. Apr. 29, 2013).  In order

to get around this clear barrier to the enhancement, the government relied on a Fifth Circuit case,

*United States v. Kay*, 513 F.3d 432 (5th Cir. 2007), to argue that Newton's shareholders were also

victims of the offense. *See* Gov. Br. at 59.  As explained in Mr. Newton's reply brief, however, the

Fifth Circuit recognizes a concept of "collateral victims," for purpose of the abuse of trust

enhancement, which is contrary to the law of this Circuit. *See* Reply Brief of the Appellant Douglas

Newton ("Reply Brief") 11, *Untied States v. Newton*, No. 12-16001 (11th Cir. June 6, 2013) (noting

the Fifth Circuit's express rejection of the argument "that the abuse of trust enhancement only

applies when a defendant abuses 'a position of trust vis-à-vis the victim of the crime.'"). *See also*

Gov. Br. at 59 n. 14 (acknowledging that the Fifth Circuit "had 'never' held that 'the determination

8

of whether a defendant occupied a position of trust must be assessed from the perspective of the victim") (citing *Kay*, 513 F.3d at 460). Because Newton's shareholders were not direct victims of the offense, the abuse of trust enhancement was error.

**B.     These issues raise substantial questions likely to result in a reduced sentence to a term of imprisonment less than the duration of the appeals process.**

Based on the foregoing, without even addressing the substantial and complicated trial issues raised in Mr. Newton's brief, Mr. Newton should be granted bond pending appeal. By the time the oral argument takes place, Mr. Newton will have served more than 13 months of his 30 month sentence. If he prevails on either of the above arguments, he will be entitled to a minimum reduction of 2 levels off of his guidelines range, for a sentencing range of (at most) 24-30 months. He believes that his properly calculated guidelines range will be lower. Mr. Newton will be entitled to up to 15 percent off of his sentence based on good time credits. Furthermore, the Bureau of Prisons has the discretion to release inmates to half-way houses for the last six months of their sentences. Thus, even by a conservative estimate, Mr. Newton would be eligible for placement into a half-way house around the time that the oral argument in this case is scheduled to take place. A decision in this case may take several more months, resulting in Mr. Newton serving more time in custody than would otherwise be appropriate. [2]

_____

[2] 18 U.S.C. § 3143(b)(1) states that, if the Court releases the defendant on bond based on a finding that the appeal is likely to result in a "reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in paragraph (B)(iv) of this paragraph, the judicial officer

There is no indication, furthermore, that a sentence above the guidelines would be necessary to fulfill the purposes of sentencing in this case. At Mr. Newton's initial sentencing, the Court recognized that Mr. Newton has "done good things," and "is probably a good man"; although the Court found that some decisions reflect "such poor judgment that criminal culpability is necessary," the Court found that the low end of the guidelines was appropriate and imposed a low-end sentence. *See* DE205:82-83.

### C. Mr. Newton's pre-sentencing conduct demonstrates that he is not likely to flee or pose a danger to the community.

Finally, bail is only warranted if the Court finds by clear and convincing evidence that Mr. Newton not likely to flee or to pose a danger to any person or to the community. Mr. Newton has proven himself trustworthy. Mr. Newton was released on bond pending trial and abided by all of the conditions of his pre-trial release, including traveling from California to Florida for court appearances. He surrendered to the Bureau of Prisons when ordered in January 2013. Mr. Newton has no criminal record, and there has never been any suggestion that he would pose a danger to anyone. Furthermore, Mr. Newton would abide by any condition the Court may set, including that he remain on home confinement during the duration of the appellate process. Therefore the Court should find, by clear and convincing evidence, that Mr. Newton does not pose a flight risk or a danger to the community.

---

shall order the detention terminated at the expiration of the likely reduced sentence.

18 U.S.C. § 3143(b)(1) (emphasis added).

## CONCLUSION

Wherefore, Mr. Newton respectfully asks this Honorable Court to grant his release on terms

and conditions of bond, pending the remainder of the appellate process.

Respectfully submitted,

MICHAEL CARUSO
Federal Public Defender


By:      s/Tracy Dreispul
         Tracy Dreispul
         Assistant Federal Public Defender
         Florida Bar No.  0634621
         150 West Flagler Street,  Suite 1500
         Miami, Florida 33130-1555
         Tel: (305) 536-6900, ext: 4243
         Fax No. (305) 530-7120
         E-Mail: Tracy_Dreispul@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on November 1, 2013, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being

served this day on Kathleen Salyer, Laura Thomas Rivero, H. Ron Davidson, and A. Cristina Perez

Soto, Assistant United States Attorneys, via transmission of Notices of Electronic Filing generated

by CM/ECF.


<u>s/Tracy Dreispul</u>_____
Tracy Dreispul

## SERVICE LIST

### United States of America v. Douglas Newton

### Case No. 11-60150-CR-MGC

### United States District Court, Southern District of Florida

**Kathleen Salyer**
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
(305) 961-9117
Fax: (305) 536-7214
Email: Kathleen.Salyer@usdoj.gov

**Laura Thomas Rivero**
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
(305) 961-9130
Fax: (305) 536-7214

**H. Ron Davidson**
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
Email: h.ron.davidson@usdoj.gov

**A. Cristina Perez Soto**
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
305-961-9122
Fax: 305-530-7976
Email: Cristina.Soto@usdoj.gov

**Tracy Dreispul**
Federal Public Defender's Office
150 W. Flagler Street, Suite 1500
Miami, FL 33130
(305) 536-6900
(305) 530-7120 - Fax
Email: Tracy_Dreispul@fd.org

13

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 11-60150-CR-MGC

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**

**DOUGLAS NEWTON,**

        **Defendant.**

_____/

### PROPOSED ORDER ON RENEWED MOTION FOR BOND
### PENDING APPEAL IN LIGHT OF CHANGED CIRCUMSTANCES

    **THIS CAUSE** came before the Court on the Renewed Motion for Bond Pending Appeal in Light of Changed Circumstances. After review of the motion, it is hereby

    **ORDERED** that the motion is **GRANTED**. Mr. Newton is released on the following terms and conditions:

    **DONE and ORDERED** at Miami, Florida, this ____ day of _____, 2013.

                    _____
                    MARCIA G. COOKE
                    UNITED STATES DISTRICT JUDGE

NO. 12-16001-EE

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

DOUGLAS NEWTON,
*Defendant/appellant.*

On Appeal from the United States District Court
for the Southern District of Florida

PETITION FOR REHEARING *EN BANC*

MICHAEL CARUSO
  Federal Public Defender
TRACY DREISPUL
  Assistant Federal Public Defender
  Attorney for Appellant Douglas Newton
  150 West Flagler Street, Suite 1500
  Miami, Florida 33130-1555
  Telephone No. (305) 536-6900

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Douglas Newton
### Case No. 12-16001-EE

Appellant, Douglas Newton, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Caridad, Miguel, Assistant Federal Public Defender

Caruso, Michael, Federal Public Defender

Cooke, Marcia G., United States District Judge

Davidson, H. Ron, Assistant United States Attorney

Dreispul, Tracy, Assistant Federal Public Defender

Ferrer, Wifredo, United States Attorney

Galvin, Harriett, Assistant United States Attorney

Goodman, Jonathan, United States Magistrate Judge

Newton, Douglas, Appellant/Defendant

Palermo, Peter R., United States Magistrate Judge

Rivero, Laura Thomas, Assistant United States Attorney

Salyer, Kathleen M., Assistant United States Attorney

Schultz, Anne R., Assistant United States Attorney

Soto, A. Cristina Perez, Assistant United States Attorney

## Statement of Counsel

I express a belief, based on reasoned and studied professional judgment, that the panel decision is contrary to the following precedents of this Circuit and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court:

*United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009) (*en banc*)

*United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002)

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007)

*United States v. Snyder*, 291 F.3d 1291 (11th Cir. 2002)

*United States v. Tatum*, 138 F.3d 1344 (11th Cir. 1998).

Respectfully submitted,

s/*Tracy Dreispul*
Assistant Federal Public Defender
Attorney of Record for Douglas Newton

i

# TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

Statement of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Citations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Statement of the Case and the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Arguments in Support of Rehearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.     A "scheme to defraud" requires proof of a material misrepresentation.. . . .  6

II.    The panel opinion erred in affirming a loss amount based on speculation

       that the stock was "worthless," where the district court refused to

       consider expert testimony regarding the value of the stock.. . . . . . . . . . .  10

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Appendix:

*United States v. Newton*,

       2014 WL 1045685 (11th Cir. Mar. 19, 2014).. . . . . . . . . . . . . . . . . . . . . A-1

# TABLE OF CITATIONS

**CASES:**

*Durland v. United States,*

      161 U.S. 306, 16 S. Ct. 508 (1896)................................. 8

*Neder v. United States,*

      521 U.S. 1, 119 S. Ct. 1827 (1999)................................ 8

*Norton v. United States,*

      92 F.2d 753 (9th Cir. 1937). ...................................... 9

*Skilling v. United States,*

      561 U.S. 358, 130 S. Ct. 2896 (2010)............................. 8

*United States v. Hasson,*

      333 F.3d 1264 (11th Cir. 2003). ................................... 6

*United States v. Medina,*

      485 F.3d 1291 (11th Cir. 2007). ........................... i, 5, 11, 12

*United States v. Newton,*

      2014 WL 1045685 (11th Cir. Mar. 19, 2014)................. 5-7, 9, 11

*United States v. Olis,*

      492 F.3d 450 (5th Cir. 2005). ................................... 12

iii

*United States v. Pendergraft,*

    297 F.3d 1198 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . i, 4, 5, 7, 9

*United States v. Snyder,*

    291 F.3d 1291 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . i, 4, 5, 10, 11

*United States v. Svete,*

    556 F.3d 1157 (11th Cir. 2009) (*en banc*). . . . . . . . . . . . . . . . . . . . i, 5, 7, 8

*United States v. Tatum,*

    138 F.3d 1344 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 5, 11

*United States v. Wetherald,*

    636 F.3d 1315 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


**STATUTORY AND OTHER AUTHORITY:**

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 2B1.1(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Statement of the Case and the Facts

Douglas Newton appeals his convictions for mail fraud, securities fraud, and conspiracy, to this Court. Newton was the Director, Chief Executive Officer, and primary shareholder of Real American Brands, Inc. ("RLAB"), a publicly traded penny stock company. He became the target of a sting operation, during which undercover FBI agents offered to have a fictitious pension fund (the "pension fund") purchase stock in RLAB in exchange for kickback payments. According to the terms of the deal, all of which were determined by the FBI, the pension fund would purchase restricted shares of RLAB stock at the market price for free-trading stock. In exchange, Newton would pay a 30% kickback to a fictitious consulting firm. The cooperating witness who brought Newton into the scheme also wanted $5,000 worth of stock for each transaction. *See* G.Ex.2A:25.

Newton agreed to the government's terms. In the first transaction, the pension fund transferred $20,000 to RLAB, in exchange for 4,000,000 restricted shares of RLAB common stock. *See* DE219:24-25. In return, Newton sent a check for $6,000 to the fake consulting firm. DE225:61-66. A second subscription agreement was executed on April 7, 2009, for 2,222,222 shares of common stock, at .009 a share, or $20,000. DE219:239-42. Newton again sent $6,000 to the fake consulting firm. DE219:41-42. DE225:75.

1

When the undercover agents indicated they did not want to conduct further deals with Newton, Newton suggested that the pension fund do business with a company owned by Yan Skwara. DE220:120.   Skwara conducted one transaction in June and one in July of 2009, both for $20,000.  After the first deal, Skwara sent Newton four separate checks totaling $6,000.  DE220:53-61.

At the close of the government's evidence, Mr. Newton moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29.  DE225:153.  The motion was denied. DE225:154.  Mr. Newton entered documents into evidence, but did not call any witnesses. DE225:167-70.  He did not renew his motion for judgment of acquittal.

In closing argument, Mr. Newton argued that the indictment charged that he sold stock to the pension fund at an "artificially inflated price," but the government failed to prove that the price was inflated.  Second, Newton argued that his statements and conduct showed that he believed in the legitimacy of his company, he believed it was ultimately a good investment, and he never intended to harm the pension fund. DE222:49-81.  Mr. Newton was convicted on all counts.

There was no actual loss.  *See* PSI ¶¶ 18, 21. According to the Pre-Sentence Investigation Report ("PSI"), the base offense level for Mr. Newton's offense, pursuant to U.S.S.G. § 2B1.1(a)(1), was 7.  The PSI added an eight-level increase,

finding that the intended pecuniary loss was between $70,000 and $120,000, based on the total $80,000 invested by the fund.  See PSI ¶ 26.

Mr. Newton argued that the district court should find no loss because if the fund had attempted to buy as many shares on the free market, it would have driven up the price. *See* 205:13-14.  Mr. Newton presented the court with testimony of government experts in other cases supporting this position.  *See* DE178; 187. Newton's sentencing memorandum also incorporated trading data provided by the government, showing that the market price for RLAB stock was higher approximately one-year after the offense.  DE170.

At the sentencing hearing, both Mr. Newton and the government had expert witnesses present who were prepared to testify as to the loss amount.  The district court refused to consider the expert testimony, stating "Well, I don't think I have a doubt about how it should be calculated." The court believed that, because there was "no reason for this stock to have been purchased in the first place," the entire purchase price was the loss amount.  DE205:20.

Newton was allowed to proffer testimony from his expert, Dr. Pomerantz, who would have testified that even though the fund received restricted shares, the discount in value was offset by the fund's ability to purchase such a large block of stock without driving up the market price. *See* DE205:38. Mr. Newton later submitted an

3

affidavit from Dr. Pomerantz stating that he would have testified that the fund suffered no economic loss. DE215-1.

The court found that Dr. Pomerantz' proposed testimony was irrelevant because "[o]nce anybody knew at the time of the restrictive nature of the stock . . . , the stock is worthless." DE205:35-36. The court determined that the entire purchase price was loss, without any offset for the value of the stock the fund received.

In his appeal to this Court, Mr. Newton argued, *inter alia*, that the government failed to prove the charges in the indictment because although he undisputedly paid the kickback, each crime specifically alleged in the indictment required proof of a material misrepresentation and he had made none. All terms of the deal were set by the government; Newton merely agreed. Prior to oral argument, Newton submitted *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002), which held that a threat to file false affidavits in connection with a civil lawsuit was not a "scheme to defraud," where the recipients could not have been fooled by the false statements.

Newton also argued that the district court erred by refusing to consider the available evidence regarding stock valuation, and by sentencing him based on speculation that the fund would have become "worthless" once the fraud was revealed. Newton argued that in *United States v. Snyder*, 291 F.3d 1291 (11th Cir. 2002), the Court held it was error for a sentencing court to refuse to consider the

4

actual value of a stock, where such information was reasonably available to it. Newton also cited *Snyder*, *United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998), and *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), in support of his argument that the fact that a transaction is procured by fraud does not turn the entire value of the transaction into intended loss.

In an unpublished opinion issued on March 19, 2014, the Court affirmed Newton's conviction and sentence. The Court wrote that "[a] 'scheme to defraud' has been broadly defined, and it may include more than fraudulent misrepresentations." *United States v. Newton*, 2014 WL 1045685, *7 (11th Cir. Mar. 19, 2014) (citing *United States v. Svete*, 556 F.3d 1157, 1161-62 (11th Cir. 2009) (*en banc*)).   The opinion did not address *Pendergraft*.

The Court also affirmed the loss calculation, stating: "the District Court found that the Pension Plan would not have bought the stock at all in the absence of the fraud, and found that, in light of the fraud, the Pension fund held stock that was essentially worthless." *See Newton*, 2014 WL 1045685 at *11.   The opinion did not address *Snyder*, *Tatum*, or *Medina*.

This Petition follows.

## ARGUMENTS IN SUPPORT OF REHEARING

## I.

## A "scheme to defraud" requires proof of a material misrepresentation.

The panel opinion fundamentally deviated from the law of this circuit and the Supreme Court by holding that material misrepresentations are not essential elements of the mail and securities fraud statutes. *See United States v. Newton*, 2014 WL 1045685, *7 (11th Cir. Mar. 19, 2014) ("A 'scheme to defraud' has been broadly defined, and it may include more than fraudulent misrepresentations." ) (citation omitted). This Court's *en banc* review is necessary to remedy the error and clarify the law of this Court.

Both the federal mail and securities fraud statutes require proof of a material misrepresentation. *See United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003) ("A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts."). In his briefs to this Court, Newton argued that there was no evidence that he made any misrepresentation in order to induce the pension fund to purchase stock at an inflated price.

Newton further argued that any such misrepresentation could not have been "material," since all terms of the deal were defined by the relevant decision makers.

6

He cited *United States v. Wetherald*, 636 F.3d 1315, 1324 (11th Cir. 2011) for the proposition that "[i]nformation is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed." *See* Corrected Br. at 17-19; Reply Br. at 17-19. Prior to oral argument, Newton submitted *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), as supplemental authority. In *Pendergraft*, the Court held that the defendants' threat to file false affidavits in connection with a civil lawsuit was not a "scheme to defraud" within the meaning of the mail fraud statute, 18 U.S.C. § 1341, because the recipient of the threat knew that the statements in the affidavit were false. *See Pendergraft*, 297 F.3d at 1209.

The panel opinion does not address either *Wetherald* or *Pendergraft*. Instead, the opinion cites *United States v. Svete*, 556 F.3d 1157, 1161-62 (11th Cir. 2009) (*en banc*) for the proposition that "[a] 'scheme to defraud' has been broadly defined, and it may include more than fraudulent misrepresentations." *United States v. Newton*, 2014 WL 1045685, *7 (11th Cir. Mar. 19, 2014). However, *Svete* does not so hold. There were indisputably misrepresentations in *Svete*. The issue was whether the mail fraud statute "requires proof that the scheme be capable of deceiving a reasonably prudent person or whether schemes aimed at the gullible or improvident are also

7

prohibited." *Svete*, 556 F.3d at 1159.  Nothing in *Svete* suggests that a mail fraud conviction may be obtained in the absence of a material misrepresentation.

To the contrary, the *Svete* opinion traces the history of the statute, which has consistently required misrepresentations.  *See Svete*, 556 F.3d at 1163 ("More than a century ago, in its first interpretation of the statute, the Supreme Court held that the prohibition of mail fraud 'includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future") (quoting *Durland v. United States*, 161 U.S. 306, 313, 16 S. Ct. 508 (1896)); *id.* at 1163 ("Although the common law crime of cheat applied only to frauds that would deceive a person of ordinary prudence, by the time Congress enacted the prohibition of mail fraud, statutes that prohibited false pretenses has remedied this deficiency in the common law").  Neither *Svete*, nor any other precedent of this Court, holds that a mail or securities fraud conviction may be obtained in the absence of a material misrepresentation or omission.

Such a holding would be inconsistent with *Neder v. United States*, 521 U.S. 1, 25, 119 S. Ct. 1827 (1999), which held "that materiality of falsehood is an element of the federal . . . fraud statutes."  *See Svete*, 556 F.3d at 1163 (quoting same). Furthermore, to interpret the phrase "scheme to defraud" so broadly as to not require an actual misrepresentation or omission would subject the statutes to vagueness

8

challenges. *See Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896 (2010) (narrowly construing criminal statute to avoid vagueness problem). It is not enough that the fictitious pensioners might have been deceived in some hypothetical way, because they were not persons to whom actual misrepresentations were made.

In this case, the government did not allege that Mr. Newton made any material misrepresentations to the undercover agents. Newton's "attemp[t] to conceal the kickback agreement with a fictitious consulting agreement," or his "numerous e-mails referring to advice he never received," *Newton*, 2014 WL 1045685 at * 8, can not be considered material misrepresentations, because Newton could not possibly have deceived the persons to whom the statements were addressed. *See Pendergraft*, 297 F.3d at 1209 ("Such falsity might have deceived some, but it could not deceive Marion County."). *See also id.* (citing *Norton v. United States*, 92 F.2d 753, 755 (9th Cir. 1937) ("There can be no intent to deceive where it is known to the party making the representations that no deception can result.")). Because Mr. Newton did not make any material misrepresentation Mr. Newton respectfully asks this Court to order rehearing *en banc*.

## II.

**The panel opinion erred in affirming a loss amount based on speculation that the stock was "worthless," where the district court refused to consider expert testimony regarding the value of the stock.**

Mr. Newton also asks for rehearing *en banc* because the panel opinion affirmed a finding of loss based entirely on speculation, after the district court expressly refused to consider available expert testimony. This was in violation of numerous precedents of this Court and warrants rehearing.

The government tried this case on the theory that the price of the stock Mr. Newton sold to the pension fund was "artificially inflated" because the fund received restricted stock at the market price for free-trading stock. Both Newton and the government had experts available to assist the court in assessing loss based on this theory. The district court erred when it refused to consider this evidence. *See United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002) (holding that district court erred in finding that calculating loss to victims was not feasible and substituting intended gain for loss amount).

The Court further applied an invalid theory of loss when it refused to offset the loss amount by the value of the stock given to the pension fund. The panel opinion

10

accepted the district court's erroneous reasoning that the entire purchase price of the stock was loss, because "the Pension Plan would not have bought the stock at all in the absence of the fraud." *Newton*, 2014 WL 1045685 *14. Yet, that could be said in every case of fraud, and the law clearly requires that loss amount be reduced by the value of services or property given to the victim. *See United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) (vacating sentence where district court used the entire gross proceeds of fraudulently-procured contracts as loss without reducing the amount by the value of services rendered); *United States v. Medina*, 485 F.3d 1291, 1303 (11th Cir. 2007) (vacating sentence where the district court used the entire amount Medicare paid out in claims as a "loss," where there was insufficient evidence that the claims were not medically necessary).

The panel opinion fails to address *Snyder*, *Tatum*, or *Medina*. The opinion states only that district court "gave a reasonable estimate of the loss that accounted for the likely effect that the undisclosed fraud would have on the market value of Defendant's company stock." *Newton*, 2014 WL 1045685 at *8. This was error because there was ***no evidence whatsoever*** that the undisclosed fraud would have affected the market value of the stock. *See* Reply Brief at 3-5.

The sentence was in clear violation of the law of this Circuit. *See Snyder*, 291 F.3d at 1296 (finding that government's accounting report overestimated loss

11

"because, unlike the circumstances presented in [another case], the stock was not totally worthless after the conspiracy was discovered"); *Medina*, 485 F.3d at 1304 (noting that a court "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines") (citations omitted).  *See also United States v. Olis*, 492 F.3d 450, 546 (5th Cir. 2005) ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.").

Wherefore, Mr. Newton respectfully asks this Honorable Court to grant rehearing *en banc*.

## CONCLUSION

Based on the foregoing, Mr. Newton respectfully asks this Court to grant rehearing *en banc*.

Respectfully Submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*s/Tracy Dreispul*
Tracy Dreispul
Assistant Federal Public Defender
150 West Flagler Street, Suite 1500
Miami, Florida 33130-1555
Telephone No. (305) 536-6900

13

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 9th day of April, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent sixteen copies to the Clerk of the Court by third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Laura Thomas Rivero, Assistant United States Attorney, 99 N.E. 4th Street, Miami, FL 33132 and Kathleen Salyer, Assistant United States Attorneys, 99 N.E. 4th Street, Miami, Florida 33132.


*s/ Tracy Dreispul*
Tracy Dreispul

14

**APPENDIX A-1**

Hon. Judge Marcia G. Cooke                              October 5, 2015
U.S. District Judge -- U.S. District Court         V I A  E X P R E S S  M A I L
400 North Miami Ave # 12-2
Miami, FL 33128

      Re:  See Attached Motion Under 28 USC 2255
           Douglas Newton (Prisoner ID #96993-004 / **Case No. 11-60150-Cr-Cooke**

As follow-up to the material I sent you on Oct. 3, 2015 (via EL 036466253 US) attached please
find completed Form AO-243 (and accompanying exhibits A,B,C,D) representing my **Motion to
Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody"** per 28 U.S.C. 2255.

The six (6) grounds raised are:

     *1) My due process rights were violated because of the way the govt. conceived and
implemented the reverse sting against me and others which netted over 30 indictments for the
DOJ and SEC over last 36-48 months;*

     *2) My due process rights were violated when the govt. gave misleading and/or untruthful
info to Judge Cooke about my" prior history" and personal character --when it had no such reliable
or substantiated info in its possession at the time it targeted me;*

     *3) My due process rights were violated when I was not able to ask the govt. questions at a
hearing when the govt. appeared to add consideration of my pro se motion to Judge Cooke's
calendar for Apr. 23, 2012;*

     *4) My due process rights were violated when the govt. failed to search for Brady
information, specifically with respect to the materials in my SEC file;*

     *5) My due process rights were violated because no expert or other witnesses testified at trial
on my behalf, in order to support the defenses raised on my behalf, including what is the definition
of an "artificially inflated price"; and*

     *6) My due process rights were further violated when inadmissible evidence from Agent
Sputo was introduced to jury, we were not able to refute same, and it was used prominently by govt.
in its closing argument.*

I understand this motion must be filed within one year of the date of the Supreme Court's order
(Oct. 6, 2014) in my case.  The motion is being filed by me *in forma pauperis.*

Thank you,

Douglas Newton
37 Lafayette Drive
Rancho Mirage, CA 92270

IORITY
MAIL ★
PRESS™

EST SERVICE IN THE U.S.

INTERNATIONALLY,
IS DECLARATION
Y BE REQUIRED.



13   OD: 12.5 x 9.5

1000006

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE ( 760-324-6834

NEWTON - DOUGLAS
37 LAFAYETTE
RANCHO MIR. CA 92270

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.   Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED *Note:* The mailer must check the "Signature Required" box if the mailer: 1)
Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4)
Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's
mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
☐ 10:30 AM Delivery Required (additional fee, where available)*
   *Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE (

JUDGE MARCIA COOKE
US DIST JUDGE
WILKIE FERGUSON CT. HOUSE
400 No. MIAMI AVE 11-2
MIAMI. FL 33128

ZIP + 4® (U.S. ADDRESSES ONLY)
3 3 1 2 8

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.


EK 928633308 US

**UNITED STATES POSTAL SERVICE®**   PR
★ I
EX

**POSTAL SERVICE USE ONLY**

92270   10·6·15   19.
10·5·15
1·55  X
1  1   CB   19.

  

LABEL 11-B, JANUARY 2014   PSN 7690-02-000-9996   1-ORIGIN

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE