October 3, 2015

Hon. Judge Marcia G. Cooke
U.S. District Judge
*Wilkie D. Ferguson, Jr. Courthouse*
400 North Miami Ave. #11-2
Miami, FL 33128

Re:    United States v. Douglas Newton
       <u>Case No: 11-60150-Cr-Cooke</u>
       <u>Supreme Court Case No: 12-16001</u>

FILED by _SAS_ D.C.

OCT 0 8 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Via Express Mail -


Re:    2255 Motion
Fr:    Douglas Newton
       Prisoner ID #96-993-004

Date:  Oct. 3, 2015

Please note I will be filing Form AO-243 (Rev. 01/15) under separate cover, on Monday, Oct. 5 or Tues. Oct. 6th, to augment the five (5) grounds shown below.

Thank you,

Douglas Newton


AO 243 (Rev. 01/15)                                                                Page 5

**GROUND ONE:** My due process  (DP) rights were violated because of the way the govt. conceived and implemented this reverse sting against me and others (which netted over 30 indictments for the AUSA and the SEC over the last 36-48 months.)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

1) The govt. sting operation is in conflict with the goal and purpose of the FBI, whose director has publicly stated the goal of the bureau is designed to stop or fight crime, not to be involved in the set up and "manufature" of new crimes.

2) Other facts and factors supporting my Ground One claim ae enumerated in my attached pro se motion DE67 filed with Judge Cooke on March 15, 2012.

---

**GROUND TWO:**   My due process rights were violated when the govt. gave misleading and/or untruthful info to Judge Cooke concerning my prior history and personal character -- when it had no such reliable or subtantiated info in its possession at the time it targeted me.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

1) In replying to my due process motion DE67. the govt argued that as a "factual" matter. it had proof of my on-going securies violations. and that I had come to the "attention of law enforcement as early as 2004". (This reference to "law enforcement" is important for reasons shown beow.)

2) the govt/ further impugned my character and credibility by advising Judge Cooke that I was a liar who "continuously defrauded investors and deserved to be the target of the govt.'s undercover operation" (DE74).

3) despite fact that the govt. did not have or did not submit any substantiated proof to Judge Cooke, she nonetheless relied -- in some part -- on the truth of the govt's statements (contained in DE74) and on what she was told by the AUSA when she denied my due process motion on Apr. 23, 2012.

4) The govt. did not tell the Judge that its sole or principal source of info about me came from its cooperating defendant, Richard Epstein (who was working to gain a sentence reduction for his own crimes) or that Epstein had recently been caught lying to his own case agent (FBI agent Michael Sputo.)

---

**GROUND THREE:   My due process rights were violated when I was not able to ask the govt. questions at a hearing when the govt. appeared to add consideration of my "due process" motion to Judge Cooke's calendar for Apr 23, 2012.**

(Supporting facts)

1) At outset of hearings on numerous motions, Judge Cooke said "I am going to go through what I think are the motions that we have to decide in advance of trial next week."   She then read through her list which did NOT include my due process motion (DE 67) or the govt.'s reply to same (DE 74) See attached transcript Exhibit A, pages 1-4, and page 61.)

2) After the Judge asked if she "missed anything?", the AUSA said "I don't know if you want to address it now, the defendant filed a pro se motion . . . "  The Judge then asked her Deputy "Can you give me a copy of that? Was that on the docket sheet?  I didn't see that." The courtroom Deputy then asked "What document entry number is that?"

3) I do not recall being advised that my due-process motion would be taken up and ruled on at this hearing on this date, nor did my attorney raise any objections when the AUSA told Judge Cooke that I had a "history of suspected securities fraud"  (See transcript of hearing p 2-4, and page 61.)

\* \* \*

**GROUND FOUR:   My due process rights were further violated when the govt. failed to search for Brandy information, specifically with respect to the materials in my SEC file.**

(Supporting facts)

_contradicted_

1) In my motion (DE 182)), my attorney advised the Court that some testimony given by Agent Sputo to attack me at trial was contracted by materials and evidence in my SEC file.  However, the govt. responded (DE 185) by telling Judge Cooke "As a legal matter, the govt. does not have

a constitutional duty to search for or disclose information possessed by other federal agencies that are not involved in the investigation or prosecution of the case."

2) Thus, I assume the govt. did not examine my SEC file -- which would have shown that my company did not spend any of the "pensioner's money" for personal expenses as stated by Agent Sputo, nor did it search for Brady material.

3) The govt. statement to Judge Cooke that no other federal agency was involved in the investigation" is belied by the SEC's own press release of June 30, 2011, stating that in the penny stock sting cases, the "SEC worked closely with the US Attorney's Office for the So. District of Florida.

4) But if the govt. did not consult with the SEC, then when, and where, and from whom did the govt. gets its information about my alleged "history of securities fraud", or that it "began as early as 2004" when I "came to the attention of law enforcement"?

\* \* \*

GROUND FIVE:  **My due process rights were further violated because no expert or other witnesses testified at trial on my behalf, in order to support the defenses raised on my behalf, including what is the definition of an "artificially inflated price".**

(Supporting facts.)

1) The term "artificially inflated price" is a phrase that has a precise, specialized meaning within the particular field of securities law.  The securities industry definition is relevant given that the sting targeted penny stocks exclusively, plus the SEC noted publicly that most defendants were charged for identical crimes civilly while announcing parallel criminal charges generated by the sting operation.

2) The term-of-art, "artificially inflated price" was cited throughout my indictment (DE 19) and thus became an essential element of the crimes for which I was charged -- both civilly and criminally as said above -- which the govt. presumably was required to prove beyond a reasonable doubt.

3) However, no expert securities witness testified on my behalf as to what "artificially inflated price" means in the securities industry

4) My sole defense -- and reason for going to trial -- was predicated on my belief that I had no intent to harm anyone, and that I did NOT sell stock to the fund for the dollars set by the fund's "fiduciary" at an "artificially inflated price."

5) It is not known to what extent my lawyer's decision to call no witnesses on my behalf influenced the jury, after he told them in opening remarks that we would call such an expert.

\* \* \*

3

*Exhibit A*

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 CASE NO. 11-CR-60150-MGC

 3
    UNITED STATES OF AMERICA,
 4
                    Plaintiff,              APRIL 23, 2012
 5        vs.
                                          MIAMI, FLORIDA
 6   DOUGLAS NEWTON,

 7                  Defendant.             Pages 1 - 71

 8   _____/

 9

10              TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE MARCIA G. COOKE
11               UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Plaintiff:      H. RON DAVIDSON, AUSA
                             LUIS PEREZ, AUSA
15                           Office of U.S. Attorney
                             99 NE 4 Street
16                           Miami, Florida   33132

17
     For the Defendant:      MIGUEL CARIDAD, AFPD
18                           Office of U.S. Public Defender
                             150 W Flagler Street
19                           Miami, Florida   33130

20

21

22   Reported By:           Diane Miller, RMR, CRR
                             Official United States Court Reporter
23                           400 N. Miami Avenue, Room 11-2
                             Miami, FL   33128
24                           (305)523-5251
                             diane_miller@flsd.uscourts.gov
25
```

MONDAY, APRIL 23, 2012.

<pre>
 1                        PROCEEDINGS
 2          THE COURT:  Good morning.
 3          THE COURTROOM DEPUTY:  We have our motion hearing,
 4   Judge, on U.S.A. versus Douglas Newton, Case Number 11-60150.
 5          THE COURT:  For the record, appearing on behalf of
 6   the United States?
 7          MR. DAVIDSON:  Good morning, Your Honor, Ron Davidson
 8   on behalf of the United States.  With me is Michael Sputo and
 9   Timothy Wright from the FBI.
10          THE COURT:  Appearing on behalf of Mr. Douglas
11   Newton?
12          MR. CARIDAD:  Good morning, Your Honor, Mr. Miguel
13   Caridad, assistant federal public defender on behalf of
14   Mr. Newton, who is in California.  He waives his presence
15   here.
16          THE COURT:  For the record, Mr. Caridad, your client
17   has elected not to appear at these motion hearings because he
18   is a resident of California; is that correct?
19          MR. CARIDAD:  Yes, Your Honor.
20          THE COURT:  You will be appearing, obviously, and
21   acting on his behalf, and he knows he has a right to be here
22   and has chosen not to?
23          MR. CARIDAD:  That's right, Your Honor.
24          THE COURT:  Mr. Caridad, I'm going to go through what
25   I think are the motions that we have to decide in advance of
</pre>

MONDAY, APRIL 23, 2012.

1   trial next week.  One is your Docket Entry Number 89,

2   defendant's motion to exclude a portion of the Government's

3   expert testimony concerning investment fraud schemes.

4        Then there is, Mr. Davidson, your motion, Docket

5   Entry 91, obvious motion to exclude Defendant Douglas Newton's

6   expert witnesses.

7        Mr. Caridad, your motion to quash the Government's

8   subpoena to produce, Docket Entry Number 96.  There is a

9   response to that, Docket Entry 97.  There is a supplemental

10  response to demand for expert disclosure, Docket Entry 98; and

11  I think those are all -- there are the proposed jury

12  instructions which I can take out of that.

13       And then there is Docket Entry 109, Government's

14  notice of intent to introduce evidence pursuant to Rule 9021;

15  and the Government's motion in limine to permit the

16  introduction of certain evidence, which is Docket Entry 110.

17       Anything I missed, Counsel?

18       MR. DAVIDSON:  Judge, I don't know if you want to

19  address now, the defendant filed a pro se motion to dismiss

20  the indictment basically saying that sting operations violate

21  his constitutional rights, and the Government had no reason

22  for going after him.  I filed a response basically citing case

23  law that these type of sting operations serve legitimate

24  government functions.  And in addition, we didn't just go

25  after him, he had a history of suspected securities fraud.  We

MONDAY, APRIL 23, 2012.

4

```
 1   ask the Court to dismiss the defendant's pro se motion to

 2   dismiss.

 3          THE COURT:  Ivan, can you give me a copy of that?

 4   Was that on the docket sheet?  I didn't see that.

 5          THE COURTROOM DEPUTY:  What document entry number is

 6   that?

 7          MR. DAVIDSON:  Judge, I'll find out, one moment.

 8          THE COURT:  Mr. Caridad, were you aware that your

 9   client was acting on his own behalf in terms of this matter?

10          MR. CARIDAD:  I told him if he wanted to file that

11   motion, I would facilitate that.  So he sent it to me, and I

12   attached it to a pleading saying, "notice of defendant's pro

13   se motion" and filed it with the Court.

14          THE COURT:  Thank you very much, Mr. Caridad.  I

15   understand.

16          All right, we will get to that.  Ivan will pull me

17   out a copy.

18          Let's start, Mr. Caridad, with your motion to exclude

19   a portion of Government's expert testimony.

20          Let me ask this question.  Should we be discussing

21   all of the expert witness issues together?

22          MR. CARIDAD:  Probably so.

23          THE COURT:  So 89, 91, 98, I think we are there.

24          All right, Mr. Caridad.

25          MR. CARIDAD:  Judge, if it's all right with the
```

MONDAY, APRIL 23, 2012.

```
 1           Now, Mr. Caridad, let's get to your client's filing
 2   pro se, Docket Entry Number 67, which I think Mr. Davidson
 3   does a good job in Docket Entry 74 of basically laying out
 4   what it is, we know we can use these types of operations, we
 5   know defendants don't like them, and I think that there is no
 6   need for me to belabor the point.
 7           Mr. Caridad, I appreciate you expediting the filing
 8   of this on behalf of your client.  I understand your
 9   situation, but Docket Entry Number 67, the motion to dismiss,
10   is denied.
11           MR. CARIDAD:  I have one more issue, Your Honor.
12           I gave --
13           THE COURT:  I have run out of paper, so I don't know
14   what the possible issue could be.  I think I have done every
15   outstanding motion.
16           MR. CARIDAD:  This is not a written motion that I
17   filed, but there were e-mails between my client and
18   Mr. Epstein.
19           Some of them the Government has and intends to
20   introduce.  I obtained other e-mails between Mr. Epstein and
21   my client by subpoenaing as many of the e-mail providers that
22   I could for Mr. Newton.
23           One of them is Google.  And I got a certificate from
24   them because they sent me the e-mails, so that's a block of
25   e-mails that I have a certificate for saying these are
```

MONDAY, APRIL 23, 2012.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-60150-CR-COOKE(s)(s)

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DOUGLAS NEWTON,

    Defendant.

_____/

*DUE PROCESS*

## NOTICE OF FILING PLEADING

  The Federal Public Defender files the attached pleading prepared by the defendant and asks the court to consider it on its merits. The government objects to Mr. Newton's motion.

      Respectfully submitted,

      MICHAEL CARUSO
      INTERIM FEDERAL PUBLIC DEFENDER

    By: /s/ Miguel Caridad
      Miguel Caridad
      Assistant Federal Public Defender
      Florida Bar No. 0161380
      150 W. Flagler Street, Suite 1700
      Miami, Florida 33130-1556
      (305) 530-7000/(305) 536-4559: Fax
      Email: miguel_caridad@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2011, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By:_____/s/ Miguel Caridad_____
Miguel Caridad

## SERVICE LIST

United States of America v. DOUGLAS NEWTON
CASE NO. 11-60150-CR-COOKE/TURNOFF(s)(s)

**Miguel Caridad, AFPD**
150 West Flagler Street Suite 1700
Miami, Florida 33130
Tel. (305) 530-7000
Fax. (305) 536-4559
miguel_cariad@fd.org

**H. Ron Davidson, AUSA**
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
Email: h.ron.davidson@usdoj.gov

I believe the conduct of the government's confidential informant and other personnel in their conception and execution of a reverse Sting Operation was so overreaching as to bar prosecution as a matter of due process of law, under the Fifth and Fourteenth Amendments of the US Constitution.    On these grounds, I move to dismiss this indictment.

## I.  QUESTIONS RAISED BY DEFENDANT

Specifically, I request that Judge Cooke consider the following:

1) Whether methods used in this Sting constituted an unjustified intrusion into citizens' privacy and autonomy running a risk that the activity would ensnare a innocent person who was otherwise minding his own business, and who was not disposed to cross over into the commission of crime but for the government's involvement.

2) Did the government manufacture a crime requiring vital materials and instruments, including the "fronting" of money to each defendant, essential to the crime's commission, which the defendants could not have provided or obtained on their own?

3) Were the method(s) employed by the government to ensnare the penny-stock defendants guided by a legitimate purpose -- namely to prevent crimes and protect the public -- or was the purpose to generate criminal charges insuring a prison term for as many defendants as possible?; and

4) Is the criminal enterprise which the government was presumably fighting -- and/or seeking to prevent-- a real crime, or one whose chances of occurring in the real world are "slim to none" at best?

## II.  BACKGROUND / FACTORS TO WEIGH IN CONSIDERING DUE PROCESS VIOLATIONS

In his book The Entrapment Defense (3rd Edition) Professor Paul Marcus writes "the rules with respect to the due process claim are difficult to state with precision . . . For many courts, the question ultimately becomes whether the government's involvement is shown to have been at a 'demonstrable level of outrageousness' or a level surpassing the limits of fundamental fairness." **(see United States v. Twigg).**
As to a definition of "outrageousness", some commentators have said "I'll know it when I see it".    Thus, trial courts look at the "totality of the circumstances" in determining if the government conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." **(United States v. Dota.)**
According to **United States v. Robinson**, among the factors to consider in evaluating a due process defense claim are: "the impetus of the scheme, the control the government exerted over the criminal enterprise, and the impact of the police activity on the commission of the crime."

The court in **United States v. Moore** discussed the problem this way:    "In determining whether police conduct has undermined constitutional due process protections, four (4) factors are considered:

1) the need for the type of government conduct in relationship to the criminal activity;
2) the pre-existence of a criminal enterprise;
3) the level of the direction or control of the criminal enterprise by the government;  and
4) the impact of the government activity to create the commission of the criminal activity."

The New Jersey Supreme Court stated it somewhat differently:    "A determination of due process entrapment requires careful scrutiny of the government conduct in light of all the surrounding circumstances.    That scrutiny focuses on:

1) whether the government or the defendant was primarily responsible for creating and planning the crime,
2) whether the government or the defendant primarily controlled and directed the commission of the crime,
3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable. And
4) whether the government had a legitimate law enforcement purpose in bringing about the crime.'*

---

*For application of the multi-factor analysis, see State v. Nelson 822 P.2d 53, 58 (Kan. 1991); United States v. Payne, 962 F.2d 1228, 1231-32 (6th Cir. 1992, cert denied, 506 U.S. 909 (1992)

According to Ted. K. Yasuda (Note, 1982, Indiana Law Journal), "the Third Circuit Court of Appeals' decision in **US v. Twigg** and the decision of a Third Circuit district court in **US v. Jannotti**" suggest "a more a workable and reasoned approach to an entrapment due process defense than a 'shocks-the-conscience' standard."

In Twigg, ". . . the court concluded that the government's tactics would not be justified as a means of detecting crime. Rather, the 'egregious conduct on the part of the government agents generated new crimes . . . merely for the sake of pressing criminal charges' and the court held such "overreaching" conduct to violate due process."

Yasuda observes that "a survey of recent cases reveals numerous questionable decisions, conflicting judicial pronouncements, and a largely affective mode of analysis that bars prosecution only if the government's involvement in or solicitation of crimes is perceived as 'outrageous'".
Yasuda further writes ". . . a due process analysis based solely on the outrageousness of the government's conduct provides no meaningful or definite standards for limiting governmental undercover activities conducted in the name of combating crime" Thus, he recommends " a more reasoned mode of analysis that has begun to emerge in recent decisions such as the district court's in **Jannotti**, upholding an entrapment-due process defense."

In US v. Jannotti, a district court for the Third Circuit interpreted **Twigg** as dealing with the "central theme. . . that, though predisposed, the defendants had in fact been induced to commit a crime they would not otherwise have been likely to commit."

According to Yasuda, "avoiding the shocks-the-conscience test, the Jannotti court overturned the convictions of city councilmen Schwartz and Jannotti notwithstanding the jury's determination that the defendants had taken bribes and had been predisposed to do so.

"The entrapment due process defense which emerges from **Twigg** and **Jannotti** combines elements of both the objective and subjective theories of entrapment.  The decisions weighed numerous factors, including

1) the nature of the defendants' predisposition and its reliability as an indicator of whether the crime would have been committed absent the government's involvement;_____
2) the defendants' prior criminal conduct and whether the defendants had been engaged in an on-going pattern of criminal activity;_____
3) the initiation of the crime by the government or defendants;_____
4) the government's provision of essential materials or services and the likelihood that the defendants could independently have obtained them from another source;____
5) the relative importance of the roles played by the government and the defendants in the offense;___
6) the difficulty of detecting the crime and the need for the tactics disclosed by the case._____
7) whether, objectively considered, the tactics adopted were calculated to overwhelm;  and___

*8)*  whether the record revealed  caution on the part of law enforcement officials to avoid the manufacturing of crime or disclosed simply a desire to obtain a conviction._____

"No one of the above factors was determinative; each was weighed in conjunction with the rest, the central inquiry remaining whether under the total circumstances the government's conduct was justified as limited to the detection of crime, rather than its promotion.

"The Twigg-Jannotti analysis possesses sufficient flexibility to safeguard the defendant's right to be free from government-created criminality, while respecting the real needs of law enforcement agents to resort to subterfuge to combat crime."

## III.  RELEVANT FACTORS IN THE INSTANT CASE

Following are facts, circumstances and conclusions which warrant a further examination by the Judiciary in considering whether due process rights have been violated:

### 1) Were the methods employed by the government to ensnare me and others guided by a legitimate purpose?

Such a purpose should have been to stop, prevent or discourage actual crimes from occurring, and to do so, in order to protect the public.

In the instant case, there appears to be little or NO evidence showing the government's interest was to infiltrate an existing or on-going criminal enterprise, or that the planners sought to minimize or prevent such crimes from occurring in the future.

In fact, the criminal "activity" which the government was presumably fighting and/or seeking to prevent is actually "a crime" of which there has been very little if any instances reported in the annals of U.S. security law violations.

Few if any fiduciaries of established Pension Funds operating in America under ERISA rules, have been accused or convicted of taking kickbacks in exchange for their agreement to make illicit purchases of "restricted" shares of stock in a class of securities issued by a "non-reporting" public company that trades in the electronic market known as the "Pink Sheets".

Yet these were exactly the kind of entities which the Sting planners exclusively sought to target and convict after catching them in the midst of pursuing and committing such a crime.

There are rules governing ERISA-compliant pension funds making it highly implausible for fiduciaries -- even corrupt ones -- to invest pension monies in penny-stock companies, much less "non-reporting" ones; and is it ever more inconceivable the fiduciary would insist that the shares being bought from such an entity would be "restricted" shares to boot, *and* purchased at a price normally paid for "unrestricted" shares.
What this suggests is that the government's Sting scheme was NOT so much intended to "take a bite out of any actual crimes" being committed now, or likely to occur in the future.  Rather, it indicates that the Sting planners had as their primary purpose a different goal:  To wit, to ensnare as many officers of penny-stock companies as possible in order to produce cases and convictions for the government.

### 2) Was the government's goal the creation and promotion of new crime, based on a desire to obtain a *prison sentence* for each CEO caught in the Sting?

The government had the specific plan to provide the prosecution with ammunition such that each defendant would be subjected to a prison sentence of not less than 12 to 18 months.   One of the first statements the AUSA made to my attorney in Jan. 2011, was that each defendant captured in the Sting would receive "a taste of jail."

To accomplish this objective, the government "fronted" each CEO with two separate wire transfers -- occurring within 14-30 days of each other -- in denominations of $20K each.
Without such cash in hand, no CEO could commit the crime at issue;  namely, paying some of this money across state lines to the "consulting company" where some of it could then be kicked back to the corrupt fiduciary.

Phase 1 -- The size and timing of the "pension's" stock purchases were calibrated  so the US Attorney could subsequently charge that the amount of the intended pecuniary harm caused by each defendant's alleged crime would be at a sentencing level of "greater than $30,000".
In short, the two stock purchases -- adding up to more than $30K --  would call for the imposition of a minimum charge of six (6) sentencing points, thereby all but insuring a category C or D sentencing level to be subsequently charged against each defendant
Since the pension did not really exist, and there could be no *actual* harm inflicted on non-existent "people", the loss amount charged by the government would be defined based on the government's contention as to what was the size of the defendant's *"intended"* or potential harm.

And since the government targeted only penny-stock companies, whose stocks are by definition speculative and risky -- according to numerous warnings published on the SEC's own website and on the Pink Sheets -- the government would be on solid ground when claiming later that pensioners whose fiduciary bought such stocks had to run a risk of losing their entire investment.

Hence, the Sting planners calculated that the size of the investors' *potential* loss, i.e., the potential pecuniary harm -- could be as high as the identical amount paid for the stock by their pension in the first place, namely at a level in excess of the government's threshold target, to wit: "greater than $30,000".
Phase 2 --  Once this prison term objective was achieved, the government planners sought to escalate charges against their targets by using a confidential informant (Epstein) and his purported business associate (actually an FBI agent named "Rob Scott") by proceeding to Phase 2 of their Sting scheme.
As laid out by Epstein, this consisted of a plan for me to illegally create new free-trading shares of stock in RLAB for which Epstein would give me $50,000, less 25%, or $12,000.    The smaller sum would be needed to help "incentivize" a few broker friends of Epstein and "Rob" who would begin purchasing RLAB stock in the open market "on behalf" of many of their wealthy and unwitting clients, whose trading accounts were controlled by their trusted brokers.

Unlike the stock sale to the Pension, which had no upward effect on RLAB's price in the open market, The Phase 2 plan would have entailed actual market price manipulation, putting $38K in my hands, while artificially driving up RLAB's stock price.   Rob and Epstein said this would benefit not only my current shareholders, but the very same "pensioners" who already held $40K "worth" of RLAB stock.
Despite their best efforts, I declined to participate in Phase 2, the purpose of which was the creation and promotion of new crimes by the government.

**3)  Did the planners use appropriate instruments and methods in order to facilitate the likelihood that the criminal activity would occur:  Without these items, would the crimes have been possible?**

As said above, the Sting planners used cash to prime the pump:  (To a micro-cap company, $20,000  was not an insignificant sum especially at the height of the economic downturn in late 2008/early 2009 when the Sting was conceived and launched.)

Other instruments included:

a) the government used a Limited Liability consulting company (named "Great Lakes Advisors, LLC") headed by a "very, very, very powerful" friend and business associate of Epstein's ("Rob Scott".) He was the same business associate whom Epstein previously referred to in *pre-sting* conversations with me when discussing my hopes to launch RLAB's new apparel line into test markets, carrying the trademark "Born & Bred in the USA."

b) the government also produced a Consulting Agreement and sample blank invoices containing Great Lakes' name.   "Rob" said they were the same as those signed by other penny-stock companies who used the consulting company.  Even though initial investments from the Pension started at $20,000, both Epstein and Rob said the Pension sometimes invested as much as $200,000 to $250,000 in a given penny stock company.    To begin, however, 30% of the $20,000 would need to be paid under the agreement with Great Lakes.

 c) the government also used an impressive looking SEC-compliant five page Subscription Agreement, from the Pension fund.   It called for my signature permitting the fund to immediately wire out the initial $20,000.  The document was purportedly already being used by the Pension for its investment in other penny-stock companies, calling for the purchase of "restricted" common stock, at a price set on the date the document was signed.

I understand now this instrument had the two fold objective of facilitating a CEO's  immediate issuance of the type of security requested by the Pension;  while producing evidence for the government to charge that I sold stock to the fund at an "inflated" price, by virtue of the fact that the shares requested by the Pension were "restricted".

d) "Rob" was also scripted to say he was "a mile wide and one inch deep" so don't expect him to actually do any real consulting work.   Thus, by my signing the Consulting Agreement with Great Lakes, and the Subscription document, the government could allege that a phony, deceptive document was employed to send an illegal kickback to a pension fiduciary in order induce the fraudulent purchase of stock in my company.

**4)  Does the record reveal that the government showed NO reading to prevent further crime or to protect the populace?**

I do not know why the government waited so long before informing me, in Jan. 2011 me that I was "one of dozens of CEO's" caught in the Sting, approximately two years earlier in March 2009.
Was it because they wanted to protect the identity of their confidential informant?   They could   have found other ways to arrest me, and keep me from spreading news about their Sting, just as they had successfully kept Epstein's prior crimes secret during the 16 months he was working as their front man.
During this waiting period, the government did NOT consider the possibility that I could have issued a press release(s) disseminating news to the investing public across America from my small retail company, that a *major national* retail *chain* (this was the purported owner of the fund) had acquired literally millions of shares of RLAB stock for their own employees and retirees of their pension fund.

I could have released this news publicly at any time. It would have been big news and pushed RLAB's stock price higher.  Apparently, either the government assumed I would not release such news, or they were unconcerned, thus taking a real risk that a public company (RLAB) could disseminate untrue information, thus committing fraud on innocent people in the populace.

The 21 month wait:   The Sting planners probably waited to bring me in, in hopes of catching me committing big crimes. I know they encouraged me to commit new crimes:   They tried this, but to no avail, in late April 2009 when Epstein and Rob offered me $38,000 (in Phase 2.)

The also tried again in February 2010 -- ten months later -- when Epstein offered me $100,000 via a "pump and dump" program in the open market whereby Epstein would utilize a "Hispanic friend named Julio", who purportedly controlled the trading accounts of several wealthy investors living in Miami and South America.

**5) Did the Sting Planners follow correct procedures, including their use of the confidential informant under authority of the Attorney General, per 28 U.S.C. 509, 510. 533. et al?**

There is nothing illegal about using an informant whom the government is compensating, in order to induce the commission of a crime.

This is true even if the informant was Epstein, a multi-millionaire who had a prior business relationship with RLAB, and stood to gain a "contingent fee" from the government amounting to something more valuable than money, namely a reduced prison term for his crime(s).

It is uncontested that Epstein had an enormous incentive to lure and nab penny-stock personnel to both Phases of the government's Sting program.

After Epstein was charged with penny-stock securities fraud in 2008, the government obviously instructed him to refrain from any further trading in penny stocks; he agreed to same as part of his cooperation deal. Prior to this time, Epstein was known to be a major investor in penny-stocks.  He also invested over $100,000 in my company in late 205/2006.

Nevertheless, during the same time he was working to help the government locate and fight penny-stock crimes and fraud in the US, Epstein continued to engage in a massive amount of penny stock trades, acquiring and most likely liquidating hundreds of millions of shares of reporting and non-reporting Penny stocks.

When confronted with this fact, Epstein originally lied to his FBI handler, but later admitted to same.
(Confirmation of this was obtained by me via Discovery in the form of an affidavit from Epstein's handler, according to which Epstein acknowledged producing hundreds of thousands of dollars in revenues for himself.   Despite lying to the FBI, as well as his other crime(s), Epstein received a sentence of probation. See attachment.)

Were the government's activities consistent with Attorney General guidelines governing the control and monitoring of the Sting and its undercover operations?   Did Epstein use any untrue representations to the government concerning his prior relationship with me -- or other innocent persons he was working to deliver to the Sting planners' net -- on the basis of which he targeted me, and was permitted to tape my phone conversations prior to luring me to his home in Florida on March 24, 2009?

Did Epstein provide any key service that would be reasonably unavailable to criminal actors but for the participation of the government?   I would not have spent three months preparing large amounts of materials for Epstein, or flying across country to Florida on March 24th had I not had prior confidence in him and in the truth of what he was telling me.

Extensive emails and phone calls took place during the 3-month "set up" period leading to March 24, 2009. So far, however, with my trial less than a week away, not all of these emails have been located or produced by the government, and only a few taped phone calls have been provided.

## IV   In Conclusion

I believe the above factors should lead this court to dismiss this indictment.

It is hard to understand why is the pursuit and inducement of criminal conduct on the part of those not originally intending to commit a crime, especially an improbable one so totally manufactured and orchestrated by their government with the motive being to send those people to prison, is not "outrageous."

In the New York case, **People vs. Isaacson**  (406 N.Y.S. 2d. 714 (N.Y. 1978), the court dealt with what judges construed as "reprehensible police action" and began its discussion by finding that the New York state constitution imposed higher standards than those set forth by the US Supreme Court, tracing the rationale for the due process clause as follows:

> "It has been said that 'due process' unlike some legal rules is not a technical conception with a fixed content unrelated to time, place circumstances.  It embraces fundamental rights and immutable principles of justice, and use of the term is but another way of saying that every person's right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice .

. .

> "Due process of law guarantees respect for personal immunities "so rooted in the tradition and conscience of our people as to be ranked as fundamental.  It imposes upon courts the duty to foster "that fundamental fairness essential to the very concept of justice."

* * *

## AFFIDAVIT

I, Michael Sputo, being duly sworn, deposes and states:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Miami, Florida Field Office. I have been employed as a special agent for over 24 years. For my entire career, I have worked principally on investigations involving white collar crimes, including securities frauds. Over the years, I have worked with numerous cooperating witnesses in undercover operations.

2. In March 2009, Richard Epstein began cooperating in an undercover capacity with the FBI. I was Mr. Epstein's primary handler and spent numerous hours with him while he was cooperating. I interacted with him on an almost daily basis. Between March 2009 and August 2010, Epstein recorded over 1000 telephone conversations and over 40 in-person meetings. To date, Epstein's recordings have been integral to charges for fifteen individuals (including approximately ten guilty pleas) and are expected to lead to charges involving up to as many as fifteen more.

3. During his cooperation, Epstein was instructed, and agreed, to refrain from any further trading in penny stocks. In approximately February 2011, I learned from a source that Epstein had, in fact, continued to trade in penny stocks. When I initially confronted Epstein about this trading, he falsely denied it. Epstein had also falsely denied any such trading in the prior months before we had obtained evidence to the contrary. Subsequently, Epstein acknowledged that he had violated his instructions and apologized for lying to me. As a result of Epstein's conduct, the FBI ceased using him in his undercover capacity. We did discuss, however, possibly having Epstein sit in on a meeting in June 2011 where he would not be required to be the undercover witness, but we ultimately did not go forward with the meeting.

4. It is my view that, prior to his dishonest conduct, Epstein was an outstanding cooperator and I believe that he should still receive credit for his cooperation. Epstein's improper trading and subsequent lying, however, was a very serious violation of his agreement and should impact the amount of credit he receives. In fact, Epstein lied to me and other agents for months by denying that he was trading in penny stocks, the very type of stocks that he had pleaded guilty to manipulating and which we were currently investigating other schemes. As a result, his value as a witness has been diminished.

5. I also believe that a jail sentence is appropriate to reflect the seriousness of his crime, properly credits the overall value of his cooperation, and because, having spent significant time with Epstein, it is clear to me that anything short of prison

1

will fail to deliver the proper message to him: that his pattern of deceitful conduct must have real consequences.

MICHAEL SPUZO
Special Agent
Federal Bureau of Investigation

2

FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   02/18/2011

Richard Epstein (protect identity) provided the following information:

On 2/11/11, SA Michael Sputo telephonically contacted Epstein, and asked Epstein when he had last spoken with Sameer (LNU), and he replied that they had spoken that morning. When asked what they spoke about, Epstein said stock deals. Epstein was asked if he had done any recent stock deals with Sameer, and he said no, that they discussed old deals on which Sameer owed him money. Epstein said that he had not done any new stock deals with Sameer in months.

Epstein was then told that SA Sputo had information that Epstein was continuing to trade stocks with Sameer. Epstein denied that he continued to do stock deals after being told by the FBI not to trade penny stocks. Epstein was told that he should call his attorney and have his attorney call SA Sputo.

A few minutes later, Epstein called SA Sputo and said that he wanted to apologize for lying to SA Sputo. Epstein then said that he had continued to trade penny stocks with Sameer after being instructed by the FBI to stop trading penny stocks. When asked why, Epstein said he needed the money. Epstein was again told to stop trading penny stocks.

On 2/16/11, at the request of SA Sputo, Epstein emailed to SA Sputo a typed summary of penny stock trading he did after being instructed not to do so by the FBI.

| | | |
|---|---|---|
| Investigation on | 02/11,16/2011 at | Miami, Florida |
| File # 318C-MM-110818 | | Date dictated |
| by | SA Michael Sputo | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

During the period from the end of March 2010 thru mid June 2010 I was involved in liquidating positions from my own accounts and from accounts controlled by Sameer Hirji. These were positions acquired by buying shares from the companies at a discounted price to the market. These positions were bought on a 50/50 basis between Hirji and myself and we shared in the proceeds equally. These include:

ITOKK, Inc. (IKTO)

Alternative Green Technology (AGTI)

Black Dragon Resources (BDGR)

International Merchant Advisors (IMAI)

The Football Network (TFBN)

The only position that was added to during that time were shares in BDGR which had been owed to us and cleared mid June 2010 and sold between 6/14/2010 and 7/15/2010 in one of Hirji's accounts thru Penson Financial.

After the above period over the next few months I entered into 3 additional "penny stock" deals with Sameer Hirji. The first was in f.ly Freight World Technologies (MYFT). This was a 504 offering presented to Hirji who asked if I wanted to participate, which I did do. The total investment was approx. $25,000 between the 2 of us made in mid November 2010 for approx. 989,000 shares and was sold over the next 3 weeks for a total of approx. $26,930.00 to be split between the 2 of us.

The 2nd deal bought was in First Global Financial Corp (FGBF).  This was a deal brought to Hirji and myself in of January 2011. It was the purchase of 1,666,667 shares of stock for $25,000.00. The stock was being sold by Omega LLC, a third party non affiliate we were told. A stock certificate was received by Oppenheimer for 1,579,571 shares to go into Hirji's account. In order to have the stock cleared the brokerage firm wanted more information from the seller regarding the "geneology" of the stock and was in contact with the seller for additional information. It took about 2 weeks for all the information to be received and processed at which time the stock cleared and Hirji started to sell. The original agreement called for the stock to be paid for the day after it clears. When the funds were ready to be sent Hirji was notified that the certificate was stopped. At that point the price per share was higher and in order to resolve the issue and so not to be bought in by Oppenheimer we were forced to pay $126,365.68 for the shares. I paid my 50% of the deal and have not received any funds in return.

The third deal I entered into was a continuation of my involvement with Camelot Entertainment Group (CMGR). This started in December '09. This was a deal brought to me in the beginning by Adam Reznikoff who I believe is a consultant for Camelot. The ongoing deal involved buying the convertible debt held by the NIR Group of companies. This was all aged debt as it was bought. The concept behind it for Camelot was that over a period of time as this debt became aged it would be bought from NIR so that they would stop converting their debt into shares and destroy the market price for Camelot shares. Conceptually it would be sold to someone who would convert the debt but not "slam" the shares into the market. The conversions of a particular note would be for 4.9% of the outstanding number of shares and the stock would be sent into Hirji's account thru Penson Financial. I do not remember the exact amount or have copies of any agreements made between Hirji and NIR/Camelot for our first tranactions in Dec/09. Although I do not have the exact amount, I believe my investment was between $20,000.00 and $25,000. I believe I received about $32,500 from the initial transactions which included sales thru February 2010.

The next series of notes were purchased beginning in July 2010. The first note, dated July 21, 2010 was for $34,800.00. That was done equally by Hirji and myself with the stock being deposited as it was converted into Hirji's account. I have a copy of that convertible note purchase agreement, an attorney opinion letter addressed to the transfer agent, Transfer Online, Inc. referencing that note, and a sample of a signed notice of conversion and a copy of a Rule 144(b)(1)Seller's representation letter for the depositing of the shares, all of which I will be glad to supply you with. During the next few months ending in mid October we purchased approx. $400,000.00 in notes which we funded equally. Since July, 2010 I have received approx. $234,000.00 in proceeds from the sale of the convertible debt. I believe there is approx. an additional $100,000.00 left on existing notes to be converted that Hirji holds.